GIBBONS INTERNATIONAL, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

J.T. GIBBONS, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 22469-85, 22470-85.    Filed December 9, 1987.

*Michael P. Farrell,* for the petitioners.
*Linda K. West,* for the respondent.

SWIFT, *Judge*: In statutory notices of deficiency dated April 2, 1985, respondent determined deficiencies in the 1978 through 1981 Federal income tax liabilities of petitioner Gibbons International, Inc., and deficiencies in and additions to the 1977 through 1980 Federal income tax liabilities of petitioner J.T. Gibbons, Inc., in the following amounts:

PETITIONER GIBBONS INTERNATIONAL, INC.
Docket No. 22469-85

| *TYE July 31—* | *Deficiency* |
| --- | --- |
| 1978 | $66,001 |
| 1979 | 102,229 |
| 1980 | 120,676 |
| 1981 | 65,650 |

PETITIONER J.T. GIBBONS, INC.
Docket No. 22470-85

| Year | Deficiency | Addition to tax sec. 6651(a)(1)[1] |
|------|-----------|-------------------------------------|
| 1977 | $14,054 | $2,108 |
| 1978 | 44,284 | 11,071 |
| 1979 | 23,562 | 0 |
| 1980 | 40,471 | 0 |

In these consolidated cases, the primary issue is whether petitioner Gibbons International qualifies during its 1978 through 1981 taxable years as a Domestic International Sales Corporation (DISC) under section 991.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. Petitioners Gibbons International and J.T. Gibbons (Gibbons) are Louisiana corporations and maintain their principal offices in New Orleans, Louisiana. Gibbons International's taxable years end on July 31. Gibbons' taxable years end on December 31. Gibbons International untimely filed its Federal Domestic International Sales Corporation income tax return (Form 1120-DISC) for its 1978 taxable year and timely filed such returns for its 1979 through 1981 taxable years. Gibbons untimely filed its Federal corporate income tax returns (Forms 1120) for 1977 and 1978, and timely filed such returns for 1979 and 1980.

Gibbons, among other things, was a seller of food, commodities, drugs, and paper products to foreign customers. Gibbons International was organized in 1974, as a wholly owned subsidiary of Gibbons, to qualify as a DISC under the Federal income tax laws. Gibbons International was to operate nominally as a commission agent of Gibbons in the export and sale of goods to foreign customers. In fact, Gibbons International was merely a paper or shell corporation. A portion of Gibbons' income from its export business was to be allocated to Gibbons International in order to receive preferential tax treatment, as further explained below.

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as in effect during the years in issue.

On August 26, 1974, Gibbons and Gibbons International entered into an agreement which included the following provisions concerning the purchase by Gibbons International of accounts receivable, or trade receivables, from Gibbons:

[Gibbons International] AGREES AS FOLLOWS:

(1) That it will from time to time purchase from [Gibbons] acceptable accounts receivable and other choses in action (all of which, whether secured or unsecured, and whether of [sic] not evidenced by negotiable instruments or other writings, are designated collectively as "accounts").

(2) That it will pay [Gibbons] one hundred percent (100%) of the net amounts thereof, less a two percent (2%) discount representing interest to [Gibbons International]. Settlement between the parties for any overpayments by the debtors, and less deduction by debtors and any unpaid compensation, charges or expenses, after actual receipt of payment of any such purchased Account will be made at such times as [Gibbons International] may determine.

(3) That [Gibbons] shall be privileged to collect for [Gibbons International] any purchased accounts receivable, but such privilege may be terminated by [Gibbons International] at any time, in its discretion, and shall automatically terminate upon the institution by or against [Gibbons] of any proceedings in bankruptcy, reorganization, receivership, insolvency, or suspension of business. Any collections which [Gibbons International] permits [Gibbons] to make shall be subject to Paragraph (5) hereof.

[Gibbons] WARRANTS, COVENANTS AND AGREES AS FOLLOWS:

(4) That each Account purchased will represent a bona fide sale and delivery of property usually dealt in by [Gibbons] or the due performance of work and labor usually done by [Gibbons] and will be for a liquidated amount maturing as stated in the assignment thereof and not subject to any offset, deduction, counterclaim, discount or condition.

(5) That [Gibbons] shall deliver to [Gibbons International] a duplicate invoice, the original shipping or other receipt, and such other papers as [Gibbons International] may require.

(6) That [Gibbons] will receive in trust and deliver to [Gibbons International], in original form and on the day of receipt, all checks, drafts, notes, acceptances, cash and other evidences or payment, applicable to any purchased Account.

(7) That immediately upon the purchase of any Account, [Gibbons] will make appropriate entries upon its books disclosing such purchase, and will execute and deliver all papers and instruments, and do all things necessary to effectuate this agreement and facilitate collection of the accounts.

Gibbons International maintained no inventory of goods for sale. It had no employees, and it had no direct

involvement in the sale by Gibbons of goods to foreign customers. Instead, all foreign sales were handled solely by Gibbons. Gibbons solicited the sales, shipped the goods, billed the customers, and reported the income from foreign sales on its Federal corporate income tax returns. Gibbons International merely accrued as income commissions equal to 4 percent of the gross income that Gibbons received on each foreign sale by Gibbons, and Gibbons accrued a tax deduction for the commissions. The only income reported by Gibbons International for financial accounting and for Federal income tax purposes was the commission income allocated to it by Gibbons.

Gibbons' and Gibbons International's books and records were prepared and maintained by an accounting firm employed by Gibbons. On a weekly basis, Gibbons delivered all documents relating to its sales to the accounting firm which prepared monthly financial statements for Gibbons, and annual financial statements for Gibbons International. The accounting firm also prepared Gibbons' and Gibbons International's Federal income tax returns.

During the years in issue, Gibbons International's books and records consisted only of a working trial balance, a rough ledger reflecting a limited number of accounting entries, and annual statements. The accounting firm made entries in the books and records of Gibbons International only twice a year, and then, only on a cumulative basis. As of December 31 and July 31 of each year, accounting entries were made reflecting total commission income allocated to Gibbons International. Generally, to reflect the commissions allocated to Gibbons International, credit entries were made to the commission income account of Gibbons International and debit entries were made to a commissions receivable account because the commissions due from Gibbons were not paid currently. A more specific description of the relevant accounting entries for each year follows.

During the 1978 and 1979 taxable years, the commissions due from Gibbons were recorded on the books of Gibbons International in an account identified on the trial balance sheet as "Commissions Receivable." During the 1980 taxable year, the balance in the Commissions Receivable account from prior years apparently was combined with

another receivables account labeled "Due for Purchase of Accounts," and the receivables reflecting commissions due for 1980 were recorded in that account. The receivables reflecting commissions due for 1981 were recorded in the Commissions Receivable account.

The amount of the entries for each year in the accounts labeled "Commissions Receivable" and "Due for Purchase of Accounts" were as follows.

*Commissions receivable as of July 31, 1978*

| | |
|---|---|
| Balance at beginning of year ..................... | $204,415.76 |
| 1978 Addition .................................. | 146,509.79 |
| Balance at end of year ......................... | 350,925.55 |

The above entries for 1978 reflect the fact that no commissions actually were paid by Gibbons to Gibbons International during Gibbons International's 1978 taxable year, and the balance in the Commissions Receivable account increased to $350,925.55 as of July 31, 1978.

*Commissions receivable as of July 31, 1979*

| | |
|---|---|
| Balance at beginning of year ..................... | $350,925.55 |
| 1979 Addition .................................. | 218,727.35 |
| Less offset of amount due Gibbons .............. | (8,477.82) |
| Less cash payment received from Gibbons......... | (8,947.00) |
| Balance at end of year ......................... | 552,228.08 |

The entries for Gibbons International's 1979 taxable year reflect an increase by $218,727.35 in the Commissions Receivable account, and the two reductions in the account reflect two payments of a portion of the commissions due. The $8,477.82 payment was in the form of a reduction of an amount due Gibbons from Gibbons International. The $8,947 payment was in the form of cash received from Gibbons.

*Due for purchase of accounts as of July 31, 1980*

| | |
|---|---|
| Balance at beginning of year .................... | $71,725.57 |
| 1980 Additions................................. | 262,560.76 |
| Transfer from commissions receivable ........... | 552,228.08 |
| Less cash payment received from Gibbons ....... | (748.25) |
| Balance at end of year ......................... | 885,766.16 |

As previously explained and as indicated above, the increase in commissions receivable of Gibbons International for the 1980 taxable year was recorded in the receivables account labeled "Due for Purchase of Accounts."[2] In addition, the balance in Gibbons International's Commissions Receivable account as of July 31, 1979 (namely, $552,228.08) was transferred to the account labeled "Due for Purchase of Accounts" as of July 31, 1980.

The above entries for Gibbons International's 1980 taxable year, therefore, reflect the transfer of the $552,228.08 balance in the Commissions Receivable account to the account labeled "Due for Purchase of Accounts," a payment of $748.25 by Gibbons to Gibbons International, and an increase during 1980 of $262,560.76 in the combined balance of the accounts "Commissions Receivable" and "Due for Purchase of Accounts" of Gibbons International.

*Commissions receivable as of July 31, 1981*

| | |
|---|---|
| Balance at beginning of year...................... | 0 |
| 1981 Addition ................................... | $143,038.49 |
| Less cash payment received from Gibbons.......... | (319.80) |
| Balance at end of year........................... | 142,718.69 |

*Due for purchase of accounts as of July 31, 1981*

| | |
|---|---|
| Balance at beginning of year...................... | $885,766.16 |
| Less offset to dividends payable account ........... | (476,036.08) |
| Balance at end of year........................... | 409,730.08 |

The above entries for Gibbons International's 1981 taxable year reflect, among other things, additional commissions due from Gibbons of $143,038.49, a payment of $319.80 in commissions, and a transfer of $476,036.08 in the account labeled "Due for Purchase of Accounts" to the Dividends Payable Account as a reduction or offset to the amount of dividends apparently owed to Gibbons by Gibbons International.

---

[2]The title "Due for Purchase of Accounts" erroneously suggests that this account was a credit or liability account. That the account was a debit or receivables account, however, is clear from the fact that the transfer of the $552,228.08 in commissions receivable into this account resulted in an increase in the balance of the account. A transfer of commissions receivable into the account would have reduced the balance thereof if the account had been a credit or liability account.

In September of 1981, within 60 days after the close of Gibbons International's 1981 taxable year, Gibbons made a cash payment of $142,718.69 to Gibbons International for commissions owed to Gibbons International for the 1981 taxable year.

On its Federal income tax returns for each taxable year at issue, Gibbons International combined the balances in its Commissions Receivable, Due for Purchase of Accounts, and Dividends Payable accounts. The combined amount was reported on Gibbons International's DISC income tax returns as "net trade receivables" and as qualified export assets. The account balances that were combined and the amounts that were reported as trade receivables for each of the years in issue are as follows:

| Account | Taxable year ended July 31— | | | |
| | 1978 | 1979 | 1980 | 1981 |
|---|---|---|---|---|
| Due for purchase of accounts | $71,725.57 | $71,725.57 | $885,766.16 | $409,730.08 |
| Commissions receivable | 350,925.55 | 552,228.08 | - - - | 142,718.69 |
| Dividends payable[3] | - - - | (328,482.00) | (476,036.08) | - - - |
| Trade receivables (net) | 422,651.12 | 295,471.65 | 409,730.08 | 552,448.77 |

In his notice of deficiency to Gibbons International, respondent determined that the commissions receivable reported by Gibbons International each year did not constitute qualified export assets because those amounts were not paid by Gibbons to Gibbons International within 60 days after the close of each taxable year. Respondent determined that Gibbons International did not qualify as a DISC for those years. Respondent also determined that Gibbons International's failure to qualify as a DISC during the years in issue was not due to reasonable cause. Respondent, therefore, did not allow Gibbons International to make deficiency distributions under section 992(c) in order retroactively to satisfy the qualified export assets test of the DISC statutory provisions as of the close of each of the taxable years in issue.

---

[3]For the 1978 taxable year, Gibbons International reported the balance in the Dividends Payable account (namely, $270,767) as a separate item on its tax return.

Respondent terminated Gibbons International's DISC status for each of the years in issue, and in his notice of deficiency issued to Gibbons, respondent determined that the income and expenses of Gibbons International were allocable to Gibbons. Respondent also determined against Gibbons an addition to tax under section 6651(a)(1) because Gibbons' 1977 and 1978 Federal income tax returns were filed late.

OPINION

The DISC provisions were enacted by Congress in 1971[4] generally to provide tax deferral for a portion of the income earned by U. S. corporations from the sale or lease of domestic products to foreign buyers. Due to minimal capitalization and organizational requirements, a DISC may be no more than a shell corporation and may serve primarily as a bookkeeping device to measure the amount of export earnings that are subject to tax deferral. *Thomas International Ltd. v. United States*, 773 F.2d 300, 301 (Fed. Cir. 1985); *Anchor Hocking Corp. v. United States*, 11 Cl. Ct. 173, 174 (1986). See also B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, par. 17.14, at 17-44 (4th ed. 1979); Note, "Fine-Tuning the DISC: Evaluation and Framework," 11 Ga. L. Rev. 902, 906 (1977); Rendell, "Use of a Domestic International Sales Corporation to Reduce Federal Income Tax on Export Earnings," 11 San Diego L. Rev. 138, 145-146 (1973).

Under section 991, DISC organizations are not subject to Federal income taxation.[5] Approximately one-half of the earnings and profits of a DISC are taxable each year to the shareholders as deemed distributions. Sec. 995(b)(1); *Westinghouse Electric Corp. v. Tully*, 466 U.S. 388, 391-392 (1984); *Gehl Co. v. Commissioner*, 795 F.2d 1324, 1327 (7th Cir. 1986), affg. in part and revg. in part a Memorandum Opinion of this Court. Any distributions made by the DISC to its shareholders out of previously untaxed earnings and

[4]Secs. 501-507 of the Revenue Act of 1971, Pub. L. 92-178, 85 Stat. 497, 535-553.

[5]SEC. 991. TAXATION OF DOMESTIC INTERNATIONAL SALES CORPORATION.

For purposes of the taxes imposed by this subtitle upon a DISC (as defined in section 992(a)), a DISC shall not be subject to the taxes imposed by this subtitle except for the tax imposed by chapter 5.

profits are taxable to the shareholders under sections 301 and 316. The retained earnings and profits of a DISC that are not taxed currently remain exempt from taxation until actually distributed to the shareholders (sec. 996(a)(1)), until a shareholder disposes of his DISC stock in a taxable transaction (sec. 995(c)), or until the corporation ceases to qualify as a DISC (sec. 995(b)(2)). *Gehl v. Commissioner, supra* at 1327.

One of the requirements for DISC status is that at least 95 percent of the adjusted basis of all of the corporation's assets be "qualified export assets" at the close of the corporation's taxable year. Sec. 992(a)(1)(B);[6] *Goldberger v. Commissioner*, 88 T.C. 1532, 1542 (1987). Section 993(b)(3) provides generally that accounts receivable of a DISC will be treated as qualified export assets if the receivables arise by reason of certain transactions of the DISC. Sec. 993(b)(3).[7]

Commissions receivable earned by a commission agent DISC are treated under section 1.993-2(a)(3) and (d)(2), Income Tax Regs., as qualifying accounts receivable and therefore as qualified export assets.[8] Where, however, the

---

[6]The qualified export asset requirement is provided in sec. 992(a)(1)(B) as follows:

SEC. 992. REQUIREMENTS OF A DOMESTIC INTERNATIONAL SALES CORPORATION.

(a) DEFINITION OF "DISC" AND "FORMER DISC".—

(1) DISC.—For purposes of this title, the term "DISC" means, with respect to any taxable year, a corporation which is incorporated under the laws of any State and satisfies the following conditions for the taxable year.

* * * * * * *

(B) the adjusted basis of the qualified export assets (as defined in section 993(b)) of the corporation at the close of the taxable year equals or exceeds 95 percent of the sum of the adjusted basis of all assets of the corporation at the close of the taxable year.

[7]Sec. 993(b)(3) provides as follows:

(b) QUALIFIED EXPORT ASSETS.—For purposes of this part, the qualified export assets of a corporation are—

* * * * * * *

(3) accounts receivables and evidences of indebtedness which arise by reasons of transactions of such corporation or of another corporation which is a DISC and which is a member of a controlled group which includes such corporation described in subparagraph (A), (B), (C), (D), (G), or (H), of subsection (a)(1).

[8]Sec. 1.993-2(a)(3) and (d)(2), Income Tax Regs., provides in relevant part as follows:

Sec. 1.993-2. Definition of qualified export assets.

(a) *In general.* For a corporation to qualify as a DISC, at the close of its taxable year it must have qualified export assets with adjusted bases equal to at least 95 percent of the sum of the adjusted bases of all its assets. * * * Under section 993(b), the qualified export assets held by a corporation are—

* * * * * * *

(3) Trade receivables described in par. (d) of this section.

* * * * * * *

domestic parent corporation of the DISC is a "related supplier" of the DISC, the circumstances under which commissions receivable are treated, under the regulations, as qualifying export assets are severely limited. In that situation, the amount of commissions receivable that the DISC wishes to treat as qualified export assets each year must be paid by the parent corporation to the DISC within 60 days after the close of the DISC's taxable year. Sec. 1.994-1(e)(3)(i), Income Tax Regs.[9]

The form of the payment for commissions receivable to a DISC from a related supplier also is spelled out in the regulations. The commissions receivable must be paid (no later than 60 days after the close of the DISC's taxable year) by cash, by a transfer of property, or by an accounting entry offsetting the DISC's Commissions Receivable account by a debt owed by the DISC to the parent company. Sec. 1.994-1(e)(3)(ii), Income Tax Regs.[10] Thus, an accounting entry that credits or decreases a Commissions Receivable account and that debits or decreases a liability account of the DISC will constitute payment if it is made within 60 days after the close of the DISC's taxable year.

(d) *Trade receivables—* * * *

(2) *Trade receivables representing commissions.* If a DISC acts as commission agent for a principal in a transaction described in sec. 1.993-1(b), (c), (d), (e), (h), or (i) which results in qualified export receipts for the DISC, and if an account receivable or evidence of indebtedness held by the DISC and representing the commission payable to the DISC as a result of the transaction arises (and, in the case of an evidence of indebtedness, designated on its face as representing such commission), such account receivable or evidence of indebtedness shall be treated as a trade receivable. If, however, the principal is a related supplier (as defined in sec. 1.994-1(a)(3)) with respect to the DISC, such account receivable or evidence of indebtedness will not be treated as a trade receivable unless it is payable and paid in a time and manner which satisfy the requirements of sec. 1.994-1(e)(3) or (5), (relating to initial payment of transfer price or commission and procedure for adjustments to transfer price or commission, respectively), as the case may be. However, see subparagraph (3) of this paragraph for rules regarding certain accounts receivable representing commissions payable to a DISC by its related supplier.

[9]Sec. 1.994-1(e)(3)(i), Income Tax Regs., provides in relevant part as follows:

(3) *Initial payment of transfer price or commission.* (i) The amount of * * * a sales commission (or reasonable estimate thereof) actually charged by a DISC to a related supplier, in a transaction to which section 994 applies must be paid no later than 60 days following the close of the taxable year of the DISC during which the transaction occurred.

[10]Sec. 1.994-1(e)(3)(ii), Income Tax Regs., provides in relevant part as follows:

(3) *Initial payment of transfer price or commission.*

* * * * * * *

(ii) Payment must be in the form of money, property (including accounts receivable from sales by or through the DISC), a written obligation which qualifies as debt under the safe harbor rule of sec. 1.992-1(d)(2)(ii), or an accounting entry offsetting the account receivable against an existing debt owed by the person in whose favor the account receivable was established to the person with whom it engaged in the transaction. * * *

Although the above regulatory provisions impose significant limitations on the ability to qualify accounts receivable as qualified export assets, the validity thereof is not challenged by petitioners. Other taxpayers have done so, but the validity of these regulations has been upheld in a number of court decisions. See *Gehl Co. v. Commissioner,* supra at 1330-1331; *CWT Farms, Inc. v. Commissioner,* 755 F.2d 790, 797-802 (11th Cir. 1985), affg. 79 T.C. 1054 (1984); *LeCroy Research Systems Corp. v. Commissioner,* 751 F.2d 123, 125-126 (2d Cir. 1984), revg. on other grounds T.C. Memo. 1984-145; *Thomas International Ltd. v. United States,* supra at 302-305, revg. *Thomas International Ltd. v. United States,* 6 Ct. Cl. 414 (1984).

Although no formal stipulation has been entered into by the parties as to whether Gibbons should be treated as a "related party" or as a "related supplier" vis-à-vis Gibbons International, both parties in their briefs analyze the issue before us in the context of the rules applicable to payments and accounts receivable due to a DISC from a related supplier. See sec. 1.993-2(a)(3) and (d)(2), and sec. 1.994-1(e)(3), Income Tax Regs., the text of which is set forth in notes 8, 9, and 10, *supra.* In light of the parties' reliance on those rules, we also analyze the issue before us on the assumption that Gibbons was a related supplier, not a related party to Gibbons International.

Petitioners argue that the agreement dated August 26, 1974, under which Gibbons International agreed to purchase accounts receivable from Gibbons, created an ongoing obligation on the part of Gibbons International to buy trade accounts receivable of Gibbons. Petitioners therefore argue that the commissions allocated to Gibbons International were "currently and continuously" paid or offset against Gibbons International's obligation to purchase accounts receivable from Gibbons, and that by virtue of that continuing obligation, trade receivables (i.e., "property" of Gibbons) automatically and simultaneously were "paid" or assigned to Gibbons International in payment of the commissions as the commissions were earned by or became payable to Gibbons International. Petitioners also argue that if the obligation of Gibbons International under the August 26, 1974, agreement did not result in contemporane-

ous payment of the commissions, then the various reductions in the Commissions Receivable account of Gibbons International should be regarded as qualifying accounting entries under section 1.994-1(e)(3), Income Tax Regs. We disagree.

The August 26, 1974, agreement between Gibbons and Gibbons International established specific documentation requirements and procedures for the sale or transfer of Gibbons' accounts receivable to Gibbons International. None of those procedures were followed. It is quite clear that no trade accounts receivable of Gibbons were ever transferred to Gibbons International. Accordingly, we hold that no "property" was transferred to Gibbons International in payment of the commissions. See sec. 1.994-1(e)(3)(ii), Income Tax Regs.

We also reject petitioners' claim that offsetting accounting entries were made to the Commissions Receivable, the Due for Purchase of Accounts, or the Dividends Payable accounts of Gibbons International that qualify as payments for purposes of the DISC provisions. The debits or increases to the account labeled "Due for Purchase of Accounts" that occurred in 1980 cannot be regarded as qualifying accounting entries under sec. 1.994-1(e)(3)(ii), Income Tax Regs., because they represented transfers of the debit balance of the Commissions Receivable account into another asset or receivables account. Thus, those entries cannot be treated as accounting entries that paid or offset the commissions receivables against debts that Gibbons International owed to Gibbons, as required by the regulations.

Commissions receivable that were transferred into the account labeled "Due for Purchase of Accounts" arguably were paid when those receivables were offset against the cumulative balance in the Dividends Payable account of Gibbons International. However, in each of the years 1978, 1979, and 1980, no accounting entries were made to the Dividends Payable account of Gibbons International to effect that offset. The netting or combining of Gibbons International's receivables accounts with its Dividends Payable account that did occur in 1979 and 1980 occurred only on the Federal income tax returns and did not reflect accounting entries that were made on the books of Gibbons

International. Therefore, with respect to each of those years, petitioners' argument has no application.

With respect to 1981, Gibbons International did make a $476,036.08 accounting entry, crediting or reducing Due for Purchase of Accounts and debiting or reducing Dividends Payable. Such an accounting entry generally would appear to qualify under the regulations as a qualifying payment of commissions receivable but only with respect to commissions receivable that arose in the current taxable year. As explained, section 1.994-1(e)(3), Income Tax Regs., expressly provides that receivables due from a related supplier must be paid during the year they occur or within 60 days thereafter, or they cannot, for that year or any subsequent year, be treated as qualified export assets. The regulatory language provides that the receivables must be paid "no later than 60 days following the close of the taxable year of the DISC *during which the transaction occurred.*" Sec. 1.994-1(e)(3)(i), Income Tax Regs. (Emphasis added.) Because the total combined balance of $885,766.16 in the two receivable accounts of Gibbons International as of the end of its 1981 taxable year constituted receivables that had accrued and accumulated in the 1978, 1979, and 1980 taxable years of Gibbons International, the reduction by $476,036.08 that occurred to those receivable accounts in September of 1981 must be regarded as untimely, and it does not qualify as a payment under section 1.994-1(e)(3)(ii), Income Tax Regs. The $476,036.08 in commissions receivable that arguably were paid by the 1981 accounting entries cannot be treated as qualified export assets in 1981.

Petitioners argue, in the alternative, that if Gibbons International does not qualify as a DISC in the years in issue because the receivables in question are not qualified export assets, there was reasonable cause for such failure and Gibbons International now should be allowed to make a deficiency distribution under the provisions of section 1.992-3(c), Income Tax Regs.[11] The parties, however, have

---

[11]Sec. 1.992-3, Income Tax Regs., provides in relevant part as follows:

Sec. 1.992-3. Deficiency distributions to meet qualification requirements.

(a) *In general.* A corporation which meets the requirements described in sec. 1.992-1 for treatment as a DISC for a taxable year, other than the 95 percent of gross receipts test described in sec. 1.992-1(b) or the 95-percent assets test described in sec. 1.992-1(c), or both tests, may nevertheless qualify as a DISC for such year by making deficiency distributions

asked the Court to resolve the primary issue in this case, as we have, before addressing petitioners' alternative argument and to allow the parties to submit supplemental briefs before deciding this alternative issue. By separate order, the Court will establish a briefing schedule with respect thereto.

Respondent also determined additions to tax under section 6651(a)(1) against Gibbons for untimely filing its 1977 and 1978 Federal income tax returns. Petitioners bear the burden of proof concerning this issue. *Marcello v. Commissioner*, 380 F.2d 499, 505-507 (5th Cir. 1967), affg. 43 T.C. 168 (1964); Rule 142, Tax Court Rules of Practice and Procedure. Petitioners, however, presented no arguments or evidence relating thereto. We sustain respondent's determination of the section 6651(a)(1) additions to tax.

For the foregoing reasons,

*An appropriate order will be entered*

(attributable to its gross receipts other than qualified export receipts and its assets other than qualified export assets) * * *

(c) *Reasonable cause for failure*—(1) *In general.* If for a taxable year, a corporation has failed to meet the 95 percent of gross receipts test, the 95 percent assets test, or both tests, such corporation may satisfy any such test for such year by means of a deficiency distribution in the amount determined under paragraph (b) of this section only if the reasonable cause requirements of this subparagraph are satisfied. Such reasonable cause requirements are satisfied if—

(i) There is reasonable cause (as determined in accordance with subparagraph (2) of this paragraph) for such corporation's failure to satisfy such test and to make such distribution prior to the date on which it was made, the time limit in subparagraph (3) of this paragraph for making the distribution is satisfied, and interest (if required) is paid in the amount and in the manner prescribed by subparagraph (4) of this paragraph, or

(ii) The time and "70-percent" requirements of the reasonable cause test of paragraph (d) of this section are satisfied.