JET RESEARCH, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; JET RESEARCH INTERNATIONAL CORPORATION, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Jet Research, Inc. v. Commissioner
Docket Nos. 39694-84, 39893-84
United States Tax Court
T.C. Memo 1990-463; 1990 Tax Ct. Memo LEXIS 508; 60 T.C.M. (CCH) 613; T.C.M. (RIA) 90463; August 28, 1990, Filed *508 Decisions will be entered under Rule 155. Held: Reallocation under sec. 61 of 100 percent of the income of a disqualified DISC, which was still subject to a valid DISC election, to its parent corporation was improper because the disqualified DISC was imbued with a business purpose and carried on substantive business activities from which it derived income. Addison International, Inc. v. Commissioner, 90 T.C. 1207 (1988), affd. 887 F.2d 660 (6th Cir. 1989) followed. Held further: The fact that the DISC was imbued with a business purpose and carried on substantive business activities does not invalidate respondent's allocation of income and deductions between the disqualified DISC and its parent to the extent necessary to clearly reflect income of the two related entities, but respondent's allocation of 100 percent of the disqualified DISC's income to the parent is arbitrary, capricious, and unreasonable under the facts of this case. Held further: Allocation of overhead, administrative, and other indirect expenses from the parent corporation to the disqualified DISC is proper to clearly reflect the income of each. Frederick G. Helmsing and John J. Crowley, Jr., for the petitioners. Helen C. T. Smith, for the respondent. SCOTT, Judge. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies in the income tax of Jet Research, Inc., and its wholly owned subsidiary Jet Research International Corporation and additions to tax for the following years and in the following amounts: Jet Research, Inc.
Tax Year
Additions to tax
Ending
Deficiency
Sec. 6653(b) [1]
1/31/78
$ 153,917.00
$  76,958.00
1/31/79
210,557.00
105,279.00
1/31/81
73,148.00
36,574.00
1/31/82
182.00
91.00
Jet Research International Corpoation
Tax Year
Additions to tax
Ending
Deficiency
Sec. 6653(b)
3/31/77
$  16,643.00
$   8,322.00
3/31/78
87,082.00
43,541.00
3/31/79
236,654.00
118,327.00
3/31/80
49,152.00
24,576.00
3/31/81
131,054.00
65,527.00
*511 Some of the issues raised by the pleadings have been disposed of by agreement of the parties leaving for our decision: (1) whether respondent was arbitrary, capricious, or unreasonable in determining under section 482 that all income reported by Jet Research International Corporation from sale of aircraft parts should, in order to clearly reflect income and prevent the evasion of taxes, be included in the income of Jet Research, Inc.; and (2) in the alternative, whether amounts reported by Jet Research International Corporation from the sale of aircraft parts should be included in the income of Jet Research, Inc. under section 61 because Jet Research, Inc., rather than Jet Research International Corporation, earned such amounts. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. At *512 the time of the filing of the petition herein, the principal place of business of both Jet Research, Inc. (Jet), and Jet ResearchInternational Corporation (Jet International) was Pensacola, Florida. Jet filed Forms 1120, "Corporate Income Tax Returns," for its fiscal years ending January 31, 1978 through January 31, 1982, with the Internal Revenue Service Center at Atlanta, Georgia. Jet International filed Forms 1120-DISC, "Domestic International Sales Corporation Returns" (DISC returns), for its fiscal years ending March 31, 1977 through March 31, 1981, with the Internal Revenue Service Center at Atlanta, Georgia. Jet was incorporated under the laws of the State of Florida on March 16, 1971, by Willa Jean Payne (Ms. Payne) and her then husband John H. Payne (Mr. Payne). From the date of its incorporation through 1979, Ms. Payne and Mr. Payne each owned 50 percent of the outstanding stock of Jet. Prior to 1979, Ms. Payne and Mr. Payne were both directors and officers of Jet. In 1979, Ms. Payne and Mr. Payne were divorced and, thereafter, all of the outstanding stock of Jet was owned by Ms. Payne. After the divorce, Ms. Payne became president of Jet and Mr. Payne did not participate *513 in the operation or management of Jet. Robert Walls, Ms. Payne's son, was the executive vice president of Jet from 1978 through 1981. During the years at issue (and continuing until the time of the trial of this case), Jet was in the trade or business of acquiring and selling used aircraft parts and supplies. Some of these parts were acquired from the excess inventories of aircraft companies and some were salvaged from wrecked or disabled aircraft. Jet refurbished and cleaned these parts and then sold them directly to third parties. Jet also sold entire aircraft engines which had been rebuilt or overhauled. Jet advertised its business in trade journals such as "World Trade Aviation," "AVD," and "Trade-a-Plane." Jet's customers included governments, overhaul facilities, and aircraft companies. In addition to selling directly to these parties, Jet would sell items to "brokers" who would, in turn, sell the items to the ultimate customer. During the years at issue, Jet occupied a large metal building on Dog Track Road in Pensacola. The building and the property on which it stood were owned and insured by Ms. Payne. Approximately 4,000 square feet of the building was devoted *514 to office space while another 15,000 square feet was devoted to warehouse space. Jet's inventory was stored in metal bins which were located in the warehouse portion of the building. Each bin was numbered and, during the earlier years at issue, Jet maintained a hand-kept card inventory system based on these numbered bins. Jet switched to a computer-based inventory system during the later years here involved. Jet maintained insurance on the inventory stored in this warehouse. If a customer ordered a part which Jet did not have in stock, Jet would locate and purchase the part from another supplier. If a part or an engine needed to be rebuilt or overhauled, Jet would subcontract the work out to an overhaul facility. When Jet sold an item, it would issue an invoice bearing the corporate logo, underneath which was the caption, "International." The sources from which all items had originally been acquired was, for Federal regulatory purposes, disclosed on the invoice. Jet derived the price it charged for its products, in part, from a new parts price list. However, the listed price was adjusted to take into account volume discounts, referral discounts, broker discounts, and the fact *515 that the parts were secondhand. In addition to a profit element, the price which Jet charged its customers for any item included the costs of purchasing, refurbishing, overhauling (if necessary), cleaning, and recertifying the item. If Jet was forced to locate and purchase a part to fill a customer's order, the price charged to the customer would include any freight charges incurred in shipping the part from the supplier to Jet. The customer would also reimburse Jet for the amounts paid by Jet in shipping an ordered item from Jet's facilities to the customer's facilities. Such costs were listed as a separate item on Jet's invoices. The terms under which Jet required payment on the issued invoices varied according to the purchaser's credit history. Jet shipped to some customers on a "cash on delivery" basis and shipped to others on a "net 30" basis. In other words, payment was due from some customers immediately, while some customers had up to 30 days to pay. Still other customers were given up to 60 or 90 days to pay. Prior to 1974, Jet had not attempted to cultivate international sales and such sales comprised no more than 5 percent of Jet's overall gross sales. At that *516 time, Jet's few international sales were made mostly through brokers. During 1974, a representative of the United States Department of Commerce contacted Jet and encouraged it to expand its international sales. Ms. Payne was informed that certain tax advantages were available with respect to international sales through the use of the Domestic International Sales Corporation (DISC) provisions of the Internal Revenue Code (sections 991 through 997). She contacted her accountant, William McAbee, in an attempt to learn more about the DISC provisions. He was not familiar with these provisions. Mr. McAbee contacted a representative of Coopers and Lybrand who traveled to Pensacola and spent one day discussing with Ms. Payne how to form and operate a DISC. Jet International was incorporated under the laws of the State of Florida on December 15, 1974, and on that date elected DISC status under section 992. On or about December 4, 1979, Jet and Jet International executed an agreement under which Jet granted Jet International an export sales franchise for the parts which Jet refurbished. Jet made a $ 2,500 capital contribution to Jet International upon its formation for which Jet received *517 all outstanding shares of Jet International stock which it has continued to own. Jet made no other capital contributions to Jet International and did not lend any money to Jet International. Ms. Payne and Mr. Payne were both officers of Jet International through 1979, when Ms. Payne became president of Jet International and Mr. Payne discontinued any participation in Jet International. Jet International did not have regular shareholder's meetings but did conduct an annual meeting which was attended by Ms. Payne, her son, and her daughter. Ms. Payne's daughter handled Jet International's bookkeeping. Although Jet continued to pay his salary, Ms. Payne's son, Robert Walls, was responsible for cultivating international customers for Jet International. As part of these sales efforts, Jet International wrote letters to potential foreign customers such as foreign overhaul facilities and foreign governments. Jet International acquired the name of these potential foreign customers from trade journals such as "World Trade Aviation." Jet International advertised its business in the same trade journals as Jet and both corporations attempted to sell Jet's inventory. Jet International also *518 received the names of potential customers from the United States Government through the Department of Commerce's "leads program." In addition, Jet International maintained an agent in South America, Mr. Nelson Punti, who helped secure business with Aero Condor, one of Jet International's main customers. During 1978 and 1979, Jet International paid $ 16,015 and $ 15,805.48, respectively, in export promotion sales commissions. Jet International's office, storage, and warehouse facilities were also located at the Dog Track Road building. The records of Jet International were kept in a file cabinet located in an office in the Dog Track Road building. Although it rarely maintained a significant amount of inventory, Jet International was allocated one section of metal bins in the Dog Track Road facility in which to store merchandise. Jet International did not pay any employee salaries during the years at issue but services were performed on behalf of Jet International by employees of Jet. Although Jet International did not have a separate telephone system from Jet, some of Jet's telephone lines were allocated to Jet International. Jet International did not have a separate "Telex" *519 line, but its customers would place orders on Jet's "Telex" line. Jet International maintained a full set of books and records, separate from those of Jet, and maintained a separate checking account. Jet International deposited its sales receipts and drew checks on its account. Jet International maintained a separate inventory card system from Jet and issued its own invoices to international customers. Jet International's invoices bore the Jet International corporate logo and the caption "Aviation Specialists." In order to comply with DISC reporting requirements, Jet International would note on each invoice the country to which each order was destined. When an order from an international customer was placed with Jet International, an employee of Jet would check to determine whether the part could be furnished from Jet's inventory. If Jet had the part, it would issue an invoice in the amount of the purchase price of the part to Jet International and, sometimes, the part could be shipped to the international customer that same day. A Jet employee would make the shipping arrangements. If a part was shipped out on the same day that Jet International's customer placed the order, *520 the part was never physically placed in Jet International's metal inventory bin. However, for bookkeeping purposes, the part was transferred from Jet's inventory to Jet International's inventory. If Jet did not have a part for which Jet International received an order or had only a portion of the parts necessary to fill the order, Jet would conduct a search throughout the industry for the missing part or parts. If Jet had some of the parts necessary to fill a Jet Iternational order, but not all parts needed, it would place the parts it had in Jet International's inventory bin while it searched for the other parts. When Jet International was first formed, Ms. Payne believed that in order to comply with the DISC provisions Jet was required to purchase the missing part once it was located and then sell it to Jet International which would, in turn, sell it to the international customer. However, in late 1979 or early 1980, Ms. Payne learned that Jet International could purchase parts directly from third parties for resale to its international customers. Thereafter, if Jet did not have the necessary part, Jet International would purchase the part directly. When Jet sold a part to *521 Jet International, it billed Jet International for the cost of the part plus 50 percent of the gross profit which would have been made if Jet had sold the part directly to the international customer. After Jet International had acquired the ordered parts from Jet, it would issue its invoice billing the international customer for an amount which included the cost of the part plus 100 percent of the profit to be made on the sale. Jet would receive its 50 percent of the profit from the sale when Jet International paid it for the part. When Jet sold similar parts to independent brokers, the same type pricing arrangement would apply. Jet would generally receive in the price it charged the broker 50 percent of the total profit which would be made on the sale of the part to the ultimate customer plus the cost of the item, but would sometimes receive as little as 40 percent of the profit. Jet would bill Jet International for the costs of shipping the part to the international customer. Jet International would, in turn, bill the international customer for this cost which had been passed on by Jet. The invoices issued by Jet to Jet International contained payment terms similar to those *522 contained in invoices which Jet issued to unrelated third-party buyers. The invoices issued by Jet International to its international customers contained payment terms similar to those contained in the invoices issued by Jet to Jet International. Jet International would pay for the parts it had purchased from Jet when it received payment from the international customer. On its DISC return for its fiscal year ending March 31, 1977, Jet International reported qualified export receipts in the amount of $ 75,011.29, costs of goods sold in the amount of $ 39,673.68, total deductions (including taxes, accounting fees, and returns and allowances) in the amount of $ 665, "taxable income" in the amount of $ 34,672.61, and deemed DISC distributions to Jet in the amount of $ 17,336.30. On its Federal income tax return for its fiscal year ending January 31, 1978, Jet reported gross receipts from the sale of aircraft parts in the amount of $ 708,796.82, costs of goods sold in the amount of $ 235,411.64, and total deductions in the amount of $ 456,050.79. It reported $ 17,336.30 in deemed DISC dividends from Jet International. Jet's reported taxable income for its 1978 fiscal year was $ 38,021.71 *523 and its total reported tax liability was $ 6,603.20. On its DISC return for its fiscal year ending March 31, 1978, Jet International reported qualified export receipts in the amount of $ 364,090.52, costs of goods sold in the amount of $ 182,303.31, total deductions (including taxes and accounting fees) in the amount of $ 366.66, "taxable income" in the amount of $ 181,420.55, and deemed DISC distributions to Jet in the amount of $ 86,537.60. On its Federal income tax return for its fiscal year ending January 31, 1979, Jet reported gross receipts from the sale of aircraft parts in the amount of $ 878,651.09, costs of goods sold in the amount of $ 427,772.06, and total deductions in the amount of $ 488,978.90. It reported $ 86,537.60 in deemed DISC dividends from Jet International. Jet's taxable income as reported for its 1979 fiscal year was $ 49,474.13 and its total tax liability as reported was $ 8,348.67. On its DISC return for its fiscal year ending March 31, 1979, Jet International reported qualified export receipts in the amount of $ 917,769.29, costs of goods sold in the amount of $ 399,137.18, total deductions (including taxes, sales commissions, and legal and accounting *524 fees) in the amount of $ 20,483.67, "taxable income" in the amount of $ 498,148.44, and deemed DISC distributions to Jet in the amount of $ 253,657.18. On its Federal income tax return for its fiscal year ending January 31, 1980, Jet reported gross receipts from the sale of aircraft parts in the amount of $ 748,035.72, costs of goods sold in the amount of $ 556,185.87, and total deductions in the amount of $ 476,979.90. It reported $ 253,657.18 in deemed DISC dividends from Jet International. Jet reported a net operating loss of $ 23,736.05 for its 1980 fiscal year. On its DISC return for its fiscal year ending March 31, 1980, Jet International reported qualified export receipts in the amount of $ 269,443.77, costs of goods sold in the amount of $ 102,502.68, total deductions (including taxes, sales commissions, and legal and accounting fees) in the amount of $ 18,240.48, "taxable income" in the amount of $ 148,700.61, and deemed DISC distributions to Jet in the amount of $ 78,002.65. On its Federal income tax return for its fiscal year ending January 31, 1981, Jet reported gross receipts from the sale of aircraft parts in the amount of $ 1,254,951.79, costs of goods sold in *525 the amount of $ 592,617.14, and total deductions in the amount of $ 664,425.49. It did not report any deemed DISC dividends from Jet International in its 1981 fiscal year. Jet reported a net operating loss in the amount of $ 883.22 for its 1981 fiscal year. On its DISC return for its fiscal year ending March 31, 1981, Jet International reported qualified export receipts in the amount of $ 1,003,983.51, costs of goods sold in the amount of $ 715,355.84, total deductions (including taxes and legal and accounting fees) in the amount of $ 3,726.85, "taxable income" in the amount of $ 284,900.82, and deemed DISC distributions to Jet in the amount of $ 144,845.00. On its Federal income tax return for its fiscal year ending January 31, 1982, Jet reported gross receipts from the sale of aircraft parts in the amount of $ 2,126,214.50, costs of goods sold in the amount of $ 1,222,132.24, and total deductions in the amount of $ 1,083,238.00. It reported $ 91,303.02 in DISC dividends from Jet International. Jet reported a net operating loss of $ 73,862.34 for its 1982 fiscal year. In accordance with the election by Jet International of DISC status under section 992 at the date of its incorporation, *526 both Jet and Jet International made a good faith effort to insure that Jet International complied with the DISC provisions and in good faith believed that Jet International did comply with such provisions. Jet International was a qualified DISC for its fiscal years ended March 31, 1975 and March 31, 1976. However, for a variety of reasons, Jet International did not qualify as a DISC for its fiscal years ended March 31, 1977, March 31, 1978, March 31, 1979, March 31, 1980, and March 31, 1981. On August 29, 1984, respondent issued timely notices of deficiency to both Jet International and Jet for the years here in issue in which he determined that: 1) Jet International did not qualify as a DISC and thus was subject to the tax imposed by section 11, and 2) under the authority of section 61 and section 482, Jet International's income should be taxed to Jet because Jet had not established that Jet International had a separate existence or that Jet International earned the income or incurred the expenses reported on its returns. OPINION Petitioners contend that respondent erred in determining under section 61 that Jet, rather than Jet International, earned the income shown on the *527 DISC returns of Jet International. Petitioners further argue that respondent's reallocation of all of Jet International's income to Jet under section 482 was arbitrary, unreasonable, or capricious, and, therefore, should be set aside. Petitioners argue that respondent's 100-percent reallocation of income from Jet International to Jet in the instant case is fundamentally inconsistent with the position taken by him in Addison International, Inc. v. Commissioner, 90 T.C. 1207, 1223 (1988), affd. 887 F.2d 660 (6th Cir. 1989), and clearly contrary to the holding of this Court in that case that the current income of a disqualified DISC is taxed to the DISC itself. Respondent in his brief states that Jet International was a qualified DISC for its fiscal years ending March 31, 1975 and March 31, 1976. Petitioners do not question this statement and we have accepted it as a fact. However, respondent contends that his position in this case is not inconsistent with his position in Addison International. Respondent points out that, in Addison International, he argued that the separate existence of the disqualified DISC should be respected (an argument *528 that we accepted) and that, consistent with such position, he concedes here that the separate existence of Jet International should be respected. Respondent claims that Jet International was nothing more than a paper corporation that did not engage in substantial business activities. According to respondent, Jet International had no separate offices or facilities, purchased and maintained no inventory, employed no one, owned no property, and made no independent sales. Respondent claims that Jet, rather than Jet International, earned the income at issue and, therefore, under section 61 and general assignment of income principles, Jet rather than Jet International should be taxed on such income. In Addison International, the taxpayer was a wholly owned domestic subsidiary (the subsidiary) which was incorporated by a domestic heating and air-conditioning manufacturing corporation (the parent) in 1973 to conduct international sales which had previously been handled by the parent. The parent was not before the Court and the period of limitations with respect to the parent's corresponding tax year had run. The subsidiary maintained a separate bank account, kept separate corporate *529 books and records, and held annual shareholder and officer meetings. However, the subsidiary had no employees, maintained no separate offices or facilities, performed no services, did not ship goods under its own name, and did not issue invoices or documents of title. The parent's sole purpose in incorporating the subsidiary was to obtain the tax deferral benefits available to a DISC with respect to its international sales. For reasons not germane to the instant case, the subsidiary failed to qualify as a DISC in its 1977 tax year and, thus, was a "former DISC" for such year. The subsidiary in Addison International argued that, if it did not qualify as a DISC for its 1977 tax year, its current income should be taxed to its parent corporation because it was a mere paper corporation devoid of business purpose or activity. Respondent argued that, because the subsidiary elected the corporate form, it should be bound by such election. In addition, respondent argued that, because the subsidiary elected the DISC form, all of its activities were imbued with a business purpose and, thus, the corporate form should not be disregarded under Moline Properties, Inc. v. Commissioner, 319 U.S. 436 (1943). *530 Respondent also suggested that te subsidiary had engaged in sufficient business activities to satisfy the minimal-business-activity test of Moline Properties. Thus, unlike the instant case, in Addison International, respondent argued that the subsidiary, rather than the parent, should be charged with the income in question. In Addison International, we acknowledged that a DISC might not be recognized as a separate corporate entity for tax purposes if it were not a DISC. Addison International, Inc. v. Commissioner, 90 T.C. at 1221 (citing section 1.992-1(a), Income Tax Regs.). We also acknowledged that a DISC sometimes does not generate the income which it reports on its returns. Addison International, Inc. v. Commissioner, 90 T.C. at 1221. However, we rejected the subsidiary's arguments, stating that: if we were to hold as petitioner requests we would, in effect, be calling a DISC a sham corporation, and this we cannot do. Congress created the DISC to implement certain objectives and we cannot undermine the statutory purpose. Rather, we must look to the regulations and the legislative history to determine how to treat the *531 current income of a disqualified DISC. Addison International, Inc. v. Commissioner, 90 T.C. at 1221. We noted that section 996 and regulations thereunder distinguish between three types of DISC income, "previously taxed income," "accumulated income," and "other earnings and profits." The legislative history of the DISC provisions indicated that the "other earnings and profits" category of income was intended to consist of: those earnings and profits of a DISC which were accumulated while the corporation was not taxed as a DISC (i.e., in a year prior to the corporation's election, or subsequent to the election if it did not qualify for the year). These are the "normal" earnings and profits of a DISC which are the same as the earnings and profits of an ordinary corporation which never was a DISC. * * * [Emphasis supplied.] S. Rept. 92-437 (1971), 1972-1 C.B. 559, 628. Based on this legislative history, we concluded that Congress must have contemplated that a former DISC would be treated as an "ordinary corporation" that derives "normal earnings and profits" (as opposed to a nullity for tax purposes) and, therefore, "the current *532 income of a disqualified DISC which is subject to a valid DISC election, is taxable to the DISC itself." Addison International, Inc. v. Commissioner, 90 T.C. at 1223. On appeal, the Sixth Circuit Court of Appeals, after examining the legislative history, statutory framework, and regulations governing DISCs, affirmed our decision. Addison International, Inc. v. Commissioner, 887 F.2d 660 (6th Cir. 1989), affg. 90 T.C. 1207 (1988). Integral to our holding in Addison International was the fact that the disqualified DISC therein had qualified as a DISC in prior years and was still subject to a valid DISC election during the year at issue. Although the subsidiary was not entitled to take advantage of the tax benefits available to a DISC during the year at issue, it still fell within the statutory framework erected by Congress and would continue to do so until its DISC election expired after 5 consecutive years of disqualification. Section 992(b)(3)(B); Addison International, Inc. v. Commissioner, 887 F.2d at 666. Under such circumstances, if we had disregarded the separate existence of the subsidiary and taxed all *533 income to the parent corporation, we would have frustrated the intent of Congress in erecting the statutory framework governing DISC's and former DISC's. Addison International, Inc. v. Commissioner, 887 F.2d at 666. We, therefore, rejected the subsidiary's argument that its "other earnings and profits" should be taxed to its parent. Our reasoning in Addison International is equally applicable regardless of whether it is the taxpayer or respondent who argues that a disqualified DISC's "other earnings and profits" should be taxed to its parent and regardless of whether the position is based on the sham corporation doctrine or section 61 assignment of income principles. As respondent contends, a taxpayer who has elected to form a corporation must produce very strong proof to show that the corporate entity of that corporation should be ignored. Also, as respondent contends, his determination that a corporation is a sham or his reallocation of its income under section 61 is generally entitled to a presumption of correctness. However, here the presumption accorded to respondent's determination is overcome by the evidence. In the Addison International case *534 we held that disqualified DISC status of a corporation imbued it with some business purpose. The same is true in this case. Also, here the evidence shows that the activities of the disqualified DISC constituted some carrying on of business. Therefore, to reallocate the entire income of the former DISC to the parent under section 61 would in effect fail to give recognition to the extent to which the income was earned by the disqualified DISC. If we were to accept respondent's 100-percent reallocation of the income of Jet International to Jet under section 61, we would effectively disregard the existence of the disqualified DISC and thus frustrate the intent of Congress in enacting a statutory scheme that contemplated and provided for the continued, albeit sometimes limited, existence of former DISC's that derive "other earnings and profits." We therefore hold, in accordance with our holding in Addison International, that the total income of Jet International is not properly allocable to Jet under section 61. Section 482 authorizes respondent to distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among organizations owned or controlled *535 by the same interests in order to clearly reflect the income of such organizations or prevent the evasion of taxes. Respondent has been granted broad discretion to make allocations under section 482 and his determinations will be disturbed only if they are arbitrary, capricious, or unreasonable. Haag v. Commissioner, 88 T.C. 604, 614 (1987); Hospital Corp. of America v. Commissioner, 81 T.C. 520, 594 (1983). The purpose of section 482 is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer by determining, according to the standard of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer, the true taxable income of the controlled taxpayer. Section 1.482-1(b)(1), Income Tax Regs.; Haag v. Commissioner, 88 T.C. at 614; Hospital Corp. of America v. Commissioner, 81 T.C. at 593. In the instant case, respondent determined that Jet and Jet International were owned and controlled by the same interests and petitioners do not contest this determination. Respondent further determined that Jet did not deal with Jet International at arm's length and that in order to clearly *536 reflect income and prevent the evasion of taxes, all of Jet International's income should be reallocated to Jet. Petitioners do contest this determination. According to respondent, the price at which Jet sold parts to Jet International was not the subject of arm's-length bargaining nor did Jet International pay any of the administrative and other indirect costs associated with its international sales and, therefore, reallocation of all of Jet International's income to Jet under section 482 is not arbitrary, capricious or unreasonable. Respondent points out that, in Addison International, we had no occasion to consider the reallocation of income under section 482 from a disqualified DISC since the taxpayer's argument in that case was based on general assignment of income principles. Addison International, Inc. v. Commissioner, 90 T.C. at 1220 n. 12. Respondent is correct in pointing out that, in Addison International, we were not faced with a situation in which respondent had exercised the considerable discretion granted to him under section 482. Petitioners apparently contend that our holding in Addison International somehow invalidates respondent's *537 determinations under section 482. We do not agree with this contention of petitioners. Congress enacted the DISC provisions to encourage increased exports by providing certain tax benefits, including income deferral, to qualified corporations engaged in international sales. S. Rept. 92-437, supra, 1972-1 C.B. at 609; Gibbons International, Inc. v. Commissioner, 89 T.C. 1156, 1163 (1987). For example, in section 994, Congress provided two "safe harbor" intercompany pricing rules which applied in determining a qualified DISC's permissible profits, even though the transfer price determined under these rules resulted in greater amounts of income being shifted to the DISC than would otherwise be allowable if each export sale between the DISC and its "related supplier" was subjected to the rigors and complexities of section 482. S. Rept. 92-437, supra, 1972-1 C.B. at 618; Brown-Forman Corp. v. Commissioner, 94 T.C. , (June 25, 1990) (slip op. at 11-13). With respect to the transfer pricing of sales to a currently qualified DISC, Congress specifically chose to override the broad discretion otherwise exercisable by respondent under section 482 in order to *538 encourage international sales. Sec. 994(a); S. Rept. 92-437, supra, 1972-1 C.B. at 618; sec. 1.994-1(a), Income Tax Regs. By its terms, however, section 994 applies only to DISC's and not to former DISC's. We find nothing that indicates that Congress intended to extend the benefits of this particular provision to corporations which were not currently qualified DISC's or otherwise immunize such corporations from the reach of section 482. We, therefore, conclude that respondent may distribute, apportion, or allocate income, deductions, credits, or allowances between and among a disqualified DISC and its parent corporation in order to clearly reflect the income of both and prevent the evasion of taxes. While we agree that respondent in an appropriate case is entitled to reallocate income between a former DISC and its parent under circumstances that warrant an allocation, we do not agree with respondent that an allocation of 100 percent of the income of Jet International to Jet under section 482 is proper in this case. The record shows that Jet International engaged in substantive business activities from which it earned some of the income which it reported. Jet International *539 kept separate books and records from those of Jet, including a separate inventory control system, and maintained a separate bank account. Jet International was allocated office space, telephone lines, and warehouse facilities at the offices also occupied by Jet. Jet International advertised in trade journals and directly solicited business. For at least a portion of the years here at issue, Jet International maintained a South American sales representative. Jet International purchased and sold some parts independent of Jet. Jet International issued its own invoices and collected its own revenues. Jet International thus earned at least some of the income it reported. Because respondent's determination that 100 percent of the income reported by Jet International must be allocated to Jet under section 482, did not take into account the substantive business activities in which Jet International wa engaged, we conclude that this determination of the 100 percent allocation under section 482 was arbitrary, capricious, and unreasonable. However, it is clear from this record that Jet paid many expenses of Jet International that in an arm's-length transaction would have been paid by *540 Jet International. Section 482 was designed, in part, to prevent the "milking" or arbitrary shifting of income or deductions away from one controlled taxpayer to another through the use of non-arm's-length transactions. Commissioner v. First Security Bank of Utah, N.A., 405 U.S. 394, 400 (1972); Hospital Corp. of America v. Commissioner, 81 T.C. at 593-594; Ach v. Commissioner, 42 T.C. 114, 125 (1964), affd. 358 F.2d 342 (1966); Hamburgers York Road, Inc. v. Commissioner, 41 T.C. 821, 833 (1964). This is precisely the situation in the instant case. Here, Jet International utilized Jet's office and warehouse facilities, yet paid no rent. It was allocated separate telephone lines from Jet's telephone, yet paid no service charges. It utilized Jet's office supplies, yet paid nothing for them. It received insurance protection, yet paid no premiums. It advertised in trade journals, yet paid no advertising costs. It received services from a number of Jet's officers and employees, yet paid no compensation to these persons. Jet paid and deducted virtually all of the overhead, administrative, and other *541 indirect expenses which arose in the operation of Jet International's export sales business (other than a small amount of legal, accounting, commission, and tax expenses). The effect of this obviously non-arm's-length arrangement was that expenses attributable to Jet International's export sales income were arbitrarily shifted to Jet resulting in severe distortions of Jet's and Jet International's taxable income. Predictably enough, Jet's taxable income decreased markedly during the years at issue, while Jet International's taxable income increased markedly. In 1978 and 1979, Jet reported taxable income in the amount of $ 38,021.71 and $ 49,474.13, respectively. In 1980, 1981, and 1982, Jet reported no taxable income and, instead, reported net operating losses totaling $ 98,481.61. During the years at issue, Jet's annual net profits/losses averaged a negative 6 percent of total gross receipts. Its costs of goods sold averaged 51.2 percent of total gross receipts and its operating costs averaged 55.6 percent of total gross receipts. In contrast, during this same period, Jet International reported "taxable income" totaling $ 1,111,843.03. During the years at issue, its net profits *542 averaged a little over 46 percent of total gross receipts. Its costs of goods sold averaged 51 percent of total gross receipts, almost the same as Jet's. However, Jet International's operating costs averaged only a little over 2 percent of total gross receipts. Petitioners contend that Jet International's fair share of overhead and indirect costs was included in the price which Jet charged Jet International for parts. It is not clear from the evidence presented exactly what was included in the price which Jet charged Jet International. We conclude, however, that petitioners have misinterpreted the record with respect to the costs included in the prices charged by Jet to Jet International. We interpret the evidence in the record as confirming our finding that the prices charged to Jet International included only direct costs (salvage, refurbishment, certification, etc.) incurred in producing the parts and did not include indirect costs such as overhead and administrative costs. The figures we have quoted above clearly indicate that indirect costs were not included in the prices charged to Jet International. Therefore, an allocation of such expenses to Jet International under *543 section 482 is appropriate. Section 1.482-2(b), Income Tax Regs.; Hospital Corp. of America v. Commissioner, 81 T.C. at 597. Neither party has suggested an allocation which might fairly take into account the expenses paid by Jet that are allocable to the export sales of Jet International. There is some evidence in the record, however, upon which we can base a reasonable allocation. We must do the best we can with what we have. Hospital Corp. of America v. Commissioner, 81 T.C. at 596-597. Using our best judgment, we conclude that Jet International must deduct on each of its fiscal year purported DISC returns an amount of expenses equal to 35 percent of its gross receipts reported on such returns. The expenses so deducted will be reallocated from the Jet return filed for the period corresponding to the fiscal years of Jet International in which the deduction is made. The amount by which Jet's income will be increased because of a decrease in its expense deduction is 35 percent of Jet International's gross receipts less the expenses actually reported by Jet International on its returns. We have considered respondent's contention that the prices *544 and payment terms under which Jet sold parts to Jet International were not arm's length. However, we conclude that these arrangements between Jet and Jet International were approximately the same as Jet's arrangements with unrelated parties and, therefore, in this sense were arm's length. With respect to payment terms, respondent claims that, although the invoices issued to Jet International indicate that it was required to make payment to Jet on substantially the same terms as those offered to unrelated third parties, in practice Jet International rarely made payment within the allotted time. This contention is not supported by the evidence. It is true that Jet International made payment only after it received payment from its international customer. However, the terms under which Jet International's customers were required to make payment were, according to Ms. Payne's testimony, identical to those under which Jet International was required to pay Jet. The invoices introduced into evidence at trial support this testimony. Ms. Payne testified that Jet International paid Jet immediately upon receipt of payment from its international customers. Contrary to respondent's contention, *545 the record shows that Jet International made payment to Jet within the time stated on the invoice or shortly thereafter. Respondent contends that petitioners have failed to present evidence that the pricing methods utilized by Jet in determining prices to charge Jet International resulted in a true arm's-length price. On its 1977, 1978, and 1979 DISC returns, Jet International claimed that the "section 482 method (arm's-length pricing)" of DISC intercompany pricing was utilized in determining the price at which Jet would sell parts to Jet International. On its 1980 and 1981 DISC returns, Jet International claimed that the "50-50 combined taxable income" method of DISC intercompany pricing was utilized. Ms. Payne, the president of both Jet and Jet International, testified that the price at which Jet sold a part to Jet International was equal to 50 percent of the profit plus the costs of readying the part for sale (i.e., the costs of salvage, refurbishment, certification). The result of this arrangement was that Jet would retain 50 percent of the profit which would have been made if it had by-passed Jet International and had sold the part directly to the international customer. *546 Ms. Payne also testified that, when Jet sold parts to independent brokers, the same pricing arrangement would apply. Jet would generally retain 50 percent of the ultimate profit and sometimes as little as 40 percent. Thus, the prices at which parts were offered to Jet International were no more advantageous than those at which parts were offered to independent third parties, without considering the failure to charge Jet International for services provided to it by Jet, and sometimes even less advantageous. This evidence, which respondent has failed to rebut, leads us to the conclusion that the price at which Jet sold parts to Jet International was equivalent to an arm's-length price. Our conclusion is further buttressed by the fact that, throughout the years at issue, Jet International's average costs of goods sold, determined as a percentage of gross receipts, were almost the same as Jet's average costs of goods sold to gross receipts (51 percent as compared to 51.2 percent). We, therefore, hold that under section 482 the cost allocation as heretofore discussed should be made and no other allocation between Jet and Jet International is necessary to clearly reflect income or *547 prevent the evasion of taxes. We will leave the method of adjusting for the deemed dividends from Jet International reported by Jet to be determined by the parties in the Rule 155 computation to the extent required by our holding in this case. Decisions will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code as amended and in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩