RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 17a0037p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

SUMMA HOLDINGS, INC.,

                *Petitioner-Appellant,*

                No. 16-1712

*v.*

COMMISSIONER OF INTERNAL REVENUE,

                *Respondent-Appellee.*

Appeal from the United States Tax Court.
No. 26476-12—Kathleen M. Kerrigan, Judge.

Argued: February 2, 2017

Decided and Filed: February 16, 2017

Before: SUHRHEINRICH, SUTTON, and McKEAGUE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Neal J. Block, BAKER & MCKENZIE, LLP, Chicago, Illinois, for Appellant. Ellen Page DelSole, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Neal J. Block, Robert S. Walton, BAKER & MCKENZIE, LLP, Chicago, Illinois, J. Timothy Bender, ROTATORI BENDER CO., L.P.A., Cleveland, Ohio, for Appellant. Ellen Page DelSole, Teresa E. McLaughlin, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

_____

## OPINION

_____

SUTTON, Circuit Judge. Caligula posted the tax laws in such fine print and so high that his subjects could not read them. Suetonius, *The Twelve Caesars*, bk. 4, para. 41 (Robert Graves, trans., 1957). That's not a good idea, we can all agree. How can citizens comply with

what they can't see? And how can anyone assess the tax collector's exercise of power in that setting? The Internal Revenue Code improves matters in one sense, as it is accessible to everyone with the time and patience to pore over its provisions.

In today's case, however, the Commissioner of the Internal Revenue Service denied relief to a set of taxpayers who complied in full with the printed and accessible words of the tax laws. The Benenson family, to its good fortune, had the time and patience (and money) to understand how a complex set of tax provisions could lower its taxes. Tax attorneys advised the family to use a congressionally innovated corporation—a "domestic international sales corporation" (DISC) to be exact—to transfer money from their family-owned company to their sons' Roth Individual Retirement Accounts. When the family did just that, the Commissioner balked. He acknowledged that the family had complied with the relevant provisions. And he acknowledged that the purpose of the relevant provisions was to lower taxes. But he reasoned that the effect of these transactions was to evade the contribution limits on Roth IRAs and applied the "substance-over-form doctrine," Appellee's Br. 41, to recharacterize the transactions as dividends from Summa Holdings to the Benensons followed by excess Roth IRA contributions. The Tax Court upheld the Commissioner's determination.

Each word of the "substance-over-form doctrine," at least as the Commissioner has used it here, should give pause. If the government can undo transactions that the terms of the Code expressly authorize, it's fair to ask what the point of making these terms accessible to the taxpayer and binding on the tax collector is. "Form" *is* "substance" when it comes to law. The words of law (its form) determine content (its substance). How odd, then, to permit the tax collector to reverse the sequence—to allow *him* to determine the substance of a law and to make it govern "over" the written form of the law—and to call it a "doctrine" no less.

As it turns out, the Commissioner does not have such sweeping authority. And neither do we. Because Summa Holdings used the DISC and Roth IRAs for their congressionally sanctioned purposes—tax avoidance—the Commissioner had no basis for recharacterizing the transactions and no basis for recharacterizing the law's application to them. We reverse.

I.

A few definitions are in order, as are a few explanations about how the tax laws in this area work.

Congress designed DISCs to incentivize companies to export their goods by deferring and lowering their taxes on export income. Here's how the tax incentives work. The exporter avoids corporate income tax by paying the DISC "commissions" of up to 4% of gross receipts or 50% of net income from qualified exports. The DISC pays no tax on its commission income (up to $10,000,000), 26 U.S.C. §§ 991, 995(b)(1)(E), and may hold onto the money indefinitely, though the DISC shareholders must pay annual interest on their shares of the deferred tax liability, *id.* § 995(f). Once the DISC has assets at its disposal, it can invest them, including through low-interest loans to the export company. *See* 26 C.F.R. § 1.993-4. Money and other assets in the DISC may exit the company as dividends to shareholders. The Code taxes dividends paid to individuals at the qualified dividend rate, *see* 26 U.S.C. § 1(h)(1)(D), 1(h)(3), 1(h)(11)(B), which (since 2003) is lower than the corporate income rate that otherwise would apply to the company's export revenue, *id.* § 11(a), (b). A DISC's shareholders often will be the same individuals who own the export company. In those cases, the net effect of the DISC is to transfer export revenue to the export company's shareholders as a dividend without taxing it first as corporate income.

Congress has made clear that corporations and other entities, including IRAs, may own shares in DISCs. 26 U.S.C. §§ 246(d), 995(g). A corporation that owns DISC shares still has to pay the full corporate income tax on any dividends, which cancels out any tax savings. *See id.* § 246(d). For a time, tax-exempt entities like IRAs paid nothing on DISC dividends, which enabled export companies to shield active business income from taxation by assigning DISC stock to controlled tax-exempt entities like pension and profit-sharing plans. But Congress closed this gap in 1989 and required tax-exempt entities to pay an unrelated business income tax, set at the same rate as the corporate income tax, on DISC dividends. *Id.* §§ 511, 995(g).

With § 995(g), Congress made it less attractive for a traditional IRA to own shares in a DISC. Investment earnings (including dividends) generally accumulate tax-free in IRAs. *Id.*

§ 408(e)(1). But DISC dividends are subject to the high unrelated business income tax when they go into an IRA and, like all withdrawals from a traditional IRA, are subject to personal income tax when they come out. *Id.* § 408(d)(1).

The same considerations do not apply to the Roth IRA, which Congress created in 1997. With traditional IRAs, savers deduct contributions and pay income tax on withdrawals, including accrued gains in their accounts. Roth IRAs work in the other direction: Savers do not deduct their contributions from pre-tax income, but they take withdrawals, including accrued gains, tax-free. *Id.* § 408A(c)(1), (d)(1).

The Code imposes contribution limits on traditional and Roth IRAs. In 2008, the maximum annual contribution to each was $5,000. *Id.* §§ 219(b)(5)(A), 408A(c)(2) (2008). The maximum annual contribution to a Roth IRA decreases as an individual's income increases. In 2008, single filers who made over $116,000 could not make any contributions to a Roth IRA. *See id.* § 408A(c)(3) (2008); Internal Revenue Serv., Publication 590, Individual Retirement Arrangements (IRAs), at 2 (2008).

At this point, one can begin to see why the owner of a Roth IRA might add shares of a DISC to his account. The owner of a closely held export company could transfer money from the company to the DISC, as the statute encourages, and pay some (or all) of that money as a dividend to its shareholders, allowing the money to enter the Roth IRA and grow there. The IRA account holder, it is true, would have to pay the high unrelated business income tax—here roughly 33%—when the DISC dividends go into the IRA. But once the Roth IRA receives the money, the account holder could invest it freely without having to pay capital gains taxes on increases in the value of each share or incomes taxes on the dividends received—just like other Roth IRA owners who buy shares of stock in companies that generate considerable dividends and rapid growth in share value. As with all Roth IRAs, the owner would not have to pay any individual income or capital gains taxes when the assets leave the account after he hits the requisite retirement age.

That's how the tax laws worked at the time of the relevant transactions. Here's how the Benenson family and the relevant companies put them to use.

Summa Holdings is the parent corporation of a group of companies that manufacture a variety of industrial products. Its two largest shareholders are James Benenson, Jr. (who owned 23.18% of the company in 2008) and the James Benenson III and Clement Benenson Trust (which owned 76.05% of the company in 2008). James Benenson, Jr. and his wife serve as the trustees, and their children, James III and Clement, are the beneficiaries of the Trust.

In 2001, James III and Clement each established a Roth IRA and contributed $3,500 apiece. Just weeks after the Benensons set up their accounts, each Roth IRA paid $1,500 for 1,500 shares of stock in JC Export, a newly formed DISC. The Commissioner did not challenge the valuation of these shares then and has not challenged them since. To prevent the Roth IRAs from incurring any tax-reporting or shareholder obligations by owning JC Export directly, the Benensons formed another corporation, JC Holding, which purchased the shares of JC Export from the Roth IRAs. From January 31, 2002 to December 31, 2008, each Roth IRA owned a 50% share of JC Holding, which was the sole owner of JC Export.

With this chain of ownership in place, the family, trust, and company were a few clicks away from the possibility of considerable future tax savings. Summa Holdings paid commissions to JC Export, which distributed the money as a dividend to JC Holding, its sole shareholder. JC Holding paid a 33% income tax on the dividends, then distributed the balance as a dividend to its shareholders, the Benensons' two Roth IRAs. From 2002 to 2008, the Benensons transferred $5,182,314 from Summa Holdings to the Roth IRAs in this way, including $1,477,028 in 2008. By 2008, each Roth IRA had accumulated over $3 million.

In 2012, the Commissioner issued notices of deficiency to Summa Holdings, the Benensons, and the Benenson Trust for the 2008 tax year but did not do so for the earlier tax years. The Commissioner informed Summa Holdings that he would apply the "substance-over-form" doctrine and reclassify the payments to JC Export as dividends from Summa Holdings to its major shareholders. As recast, the transfers did not count as commissions from Summa Holdings to JC Export. That meant Summa Holdings had to pay income tax on the DISC commissions it deducted, and JC Holding obtained a refund for the corporate income tax it had paid on its dividend from JC Export. The commissions became dividends to Benenson Jr. and the Trust, all in proportion to their ownership shares. The Commissioner determined that each

Roth IRA received a contribution of $1,119,503. Because James III and Clement both made over $500,000 in 2008, they were not eligible to contribute anything to their Roth IRAs. The Commissioner imposed a six-percent excise tax penalty on the contributions. *See* 26 U.S.C. § 4973. The Commissioner also imposed a $56,182 accuracy-related penalty on Summa Holdings. *See id.* §§ 6662, 6662A.

Summa Holdings and the Benensons challenged the Commissioner's action in the Tax Court. It upheld the Commissioner's recharacterization of the transactions but not the accuracy-related penalty. Summa Holdings, which has its principal place of business in Ohio, challenged that decision in our court. *Id.* § 7482(a). The Benensons and the Trust have related appeals pending before the First and Second Circuits.

II.

In assessing the Tax Court's decision, we begin with a basic point: The Internal Revenue Code allowed Summa Holdings and the Benensons to do what they did. Section 995(g) expressly contemplates that tax-exempt entities like traditional IRAs may own DISC shares. It just requires that they pay unrelated business income tax on any dividends. The Benensons paid those taxes. Section 408A requires the Commissioner to treat Roth IRAs the same as traditional IRAs unless the Code says otherwise. When it comes to DISC dividends, the Code does not say otherwise. Both sides to this dispute thus agree that these transactions, as consummated, complied in full with the Internal Revenue Code. If this case dealt with any other title of the United States Code, we would stop there, end the suspense, and rule for Summa Holdings and the Benensons.

But when it comes to the Internal Revenue Code, the Commissioner claims a right to reclassify Code-compliant transactions under the "substance-over-form doctrine" in order to respect "overarching . . . principles of federal taxation." Appellee's Br. 39, 41. Overarching indeed. As he sees it, the doctrine allows him to nullify the DISC commissions and dividends to the Roth IRAs on the ground that the purpose of the transactions was to sidestep the contribution limits on Roth IRAs and lower the tax obligations of the Benenson sons in the process. That is a step too far. It's one thing to permit the Commissioner to recharacterize the economic substance

of a transaction—to honor the fiscal realities of what taxpayers have done over the form in which they have done it. But it's quite another to permit the Commissioner to recharacterize the meaning of statutes—to ignore their form, their words, in favor of his perception of their substance.

As originally conceived and as traditionally used, the substance-over-form doctrine has something to it. In writing the tax laws, Congress uses many general terms—"income," "indebtedness," "corporate reorganization"—that refer to real-world economic activities, and it assigns tax consequences to those activities. When the courts decide how to classify a transaction, they focus, quite appropriately, on the transaction's workaday realities, not the labels used by the taxpayers. Take "income." If a taxpayer receives something of value, 26 U.S.C. § 61(a), he can call it whatever he wants—this, that, or something else. What the taxpayer cannot do is claim that the label he affixes on the transaction precludes it from being "income" under the Code or prevents the courts from treating it as "income" under the Code.

*Diedrich v. Commissioner* illustrates the point. It held that when a donor gives a monetary gift on the condition that the recipient pay the gift tax, the donor has received taxable "income" from the recipient equal to the tax paid. 457 U.S. 191, 196–97 (1982). That's sensible. The dollars-and-cents reality is that the donor "sold" the gift to the recipient for the price of the gift tax, making it appropriate (if a tad ungrateful) to require the donor, not the donee, to pay taxes on the income from the sale. A focus on the economic substance of the transaction is just what the Code contemplates and just what the Commissioner and courts may consider.

What's sometimes called the "sham" transaction doctrine, but which comes to the same end, likewise looks to the economic realities of the business deal. The Commissioner may disregard a nominally independent entity, for example, if it is an impostor—a label/form placed on the entity to disguise its substance/economic reality. *Wells Fargo & Co. v. United States*, 641 F.3d 1319, 1325 (Fed. Cir. 2011). Here too courts ask whether the transaction has any "economic substance" to it. *See Richardson v. Comm'r*, 509 F.3d 736, 741 (6th Cir. 2007). Congress has codified this principle for transactions after 2010, 26 U.S.C. § 7701(*o*), and, relatedly, has long empowered the Commissioner and the courts to pierce the corporate veil and

reallocate income among jointly controlled entities if the owner shifts assets around for tax purposes in a way that would never result from genuine arm's-length transactions. *Id.* § 482; 26 C.F.R. § 1.482-1.

Hence: A corporation that shuffles shares from one entity to another in order to avoid capital gains tax may not obtain the tax benefits that come with a genuine corporate "reorganization." *Gregory v. Helvering*, 293 U.S. 465, 468–69 (1935); *Minn. Tea Co. v. Helvering*, 302 U.S. 609, 612–13 (1938). A taxpayer is not "indebted"—and thus not entitled to deduct his interest payments—when the "loan" has no business function other than enabling those deductions and does not create a true obligation to pay interest. *Knetsch v. United States*, 364 U.S. 361, 365–66 (1960). And when a family sets up an ordinary corporation owned by Roth IRAs and pays the corporation fees for sham "services" that it never performed, the Commissioner may rightly refuse to recognize the Roth IRA's gains as investment earnings and may reclassify them as contributions. *See Repetto v. Comm'r*, 103 T.C.M. (CCH) 1895, at *9 (2012).

But these economic-substance principles—which undergird the traditional use of the substance-over-form doctrine—do not give the Commissioner purchasing power here. Congress designed DISCs to enable exporters to defer corporate income tax. The Code authorizes companies to create DISCs as shell corporations that can receive commissions and pay dividends that have no economic substance at all. *See* 26 C.F.R. § 1.994-1(a); *Addison Int'l, Inc. v. Comm'r*, 887 F.2d 660, 666 (6th Cir. 1989); *Jet Research, Inc. v. Comm'r*, 60 T.C.M. (CCH) 613 (1990). By congressional design, DISCs are all form and no substance, making it inappropriate to tag Summa Holdings with a substance-over-form complaint with respect to its use of DISCs.

The same is true for the Roth IRAs. They, too, are designed for tax-reduction purposes. And that's just how the Benensons used them. At the time, the Internal Revenue Code permitted traditional and Roth IRAs to own DISCs, and for reasons of its own Congress said that both types of IRAs should be treated the same. All IRAs are permitted to hold shares of stock, some of which may increase markedly in value over time and some of which may generate considerable dividends over time. Whether Congress's decision to permit Roth IRAs to own DISCs was an oversight makes no difference. It's what the law allowed.

So far so good.  The Commissioner, Summa Holdings, and we share the same understanding of these versions of the substance-over-form doctrine, and we all agree that they don't apply here.  None of these transactions was a labeling-game sham or defied economic reality.

That leaves the Commissioner to invoke another, distinct version of the substance-over-form doctrine.  When two potential options for structuring a transaction lead to the same end and the taxpayers choose the lower-tax path, the Commissioner claims the power to recharacterize the transactions as the higher-taxed equivalents.  It's not that the transactions don't have economic substance (they do) or that the Code forbids them (it doesn't).  Instead, the Commissioner simply stipulates that the "real" transaction is the higher-taxed one, and that the lower-taxed route, often the more complex of the two, is a mere "formality" he can freely disregard.  The Commissioner claims the right to assert this power against "any given transaction[,] based on [the] facts and circumstances" of the arrangement.  Appellee's Br. 63.  That is a much broader (and more worrisome) version of the doctrine.

In the Commissioner's defense, a kernel of this idea does not come out of left field.  As support, he points to a seventy-two-year-old opinion of the Supreme Court.  In *Commissioner v. Court Holding Co.*, the taxpayers wound up their corporation, transferred its sole asset—an apartment building—to themselves as a liquidating dividend, then sold the building to a third party.  324 U.S. 331, 333 (1945).  But in a real-world economic sense, the Court held, the corporation sold the building directly to the buyer.  *Id.* at 333–34.  Justice Black's opinion for a unanimous court is brief, and it's hard to say whether the Court determined that the liquidation before the sale was a sham or recharacterized the transactions based solely on their tax-minimizing effect.

As *Court Holding* suggests, the line between disregarding a too-clever-by-half accounting trick and nullifying a Code-supported tax-minimizing transaction can be elusive.  Some cases from our court, fact specific though they are, offer hints of a broad reading of *Court Holding*, saying that the Commissioner may recharacterize transactions, even those with economic substance, if they have no "valid, non-tax business purpose."  *Estate of Kluener v. Comm'r*, 154 F.3d 630, 636 (6th Cir. 1998) (recharacterizing sale of horses from closely held

corporation as direct sale from the corporation's owner); *see also Aeroquip-Vickers, Inc. v. Comm'r*, 347 F.3d 173, 183 (6th Cir. 2003) (refusing to treat a series of transactions as a "corporate reorganization" where taxpayer intended to avoid reporting recaptured tax credits). Decisions from our sister courts also straddle the line between holding that the transactions were a sham and suggesting that the Commissioner has a broad power to recharacterize transactions that minimize taxes, though none of them holds that a tax-avoidance motive alone may nullify an otherwise Code-compliant and substantive set of transactions. *See, e.g.*, *Feldman v. Comm'r*, 779 F.3d 448, 457 (7th Cir. 2015) (disregarding sham loan designed to avoid income tax); *Southgate Master Fund, LLC ex rel. Montgomery Capital Advisers, LLC v. United States*, 659 F.3d 466, 491–92 (5th Cir. 2011) (disregarding sham partnership); *Rogers v. United States*, 281 F.3d 1108, 1113–18 (10th Cir. 2002) (recharacterizing a secured loan that had no likelihood of ever being repaid as a sale).

A broad reading of *Court Holding*, at least as advanced by the Commissioner here, is hard to square with the Supreme Court's textually respectful methods of statutory interpretation. Keep in mind what is at issue in each of these cases:  the meaning of words in the Code like "income," "reorganization," and "debt," or as here words like "contribution" or "dividend."  It's fine—indeed essential—to attend to economic realities in deciding whether one of these terms covers a transaction.  But it's odd to reject a Code-compliant transaction in the service of general concerns about tax avoidance.  Before long, allegations of tax avoidance begin to look like efforts at text avoidance.  What started as a tool to prevent taxpayers from placing labels on transactions to avoid tax consequences they don't like runs the risk of becoming a tool that allows the Commissioner to place labels on transactions to avoid textual consequences he doesn't like.

The substance-over-form doctrine, it seems to us, makes sense only when it holds true to its roots—when the taxpayer's formal characterization of a transaction fails to capture economic reality and would distort the meaning of the Code in the process.  But who is to say that a low-tax means of achieving a legitimate business end is any less "substantive" than the higher-taxed alternative?  There is no "patriotic duty to increase one's taxes," as Judge Learned Hand memorably told us in the case that gave rise to the economic-substance doctrine.  *Helvering v.*

*Gregory*, 69 F.2d 809, 810 (2d Cir. 1934). "Any one may so arrange his affairs that his taxes shall be as low as possible; he is not bound to choose that pattern which will best pay the Treasury." *Id.* If the Code authorizes the "formal" transactions the taxpayer entered into, then "it is of no consequence that it was all an elaborate scheme to get rid of income taxes." *Id.*; *see also* David P. Hariton, *Sorting Out the Tangle of Economic Substance*, 52 Tax Law. 235, 236–41 (1999).

Professor Joseph Isenbergh put the point well: "When someone calls a dog a cow and then seeks a subsidy provided by statute for cows, the obvious response is that this is not what the statute means. It may also happen that rich people who would not otherwise have cows buy them to gain cow subsidies. Here, when people say (as they do) that this is not what the statute means, they are in fact saying something quite different." *Musings on Form and Substance in Taxation: Federal Taxation of Incomes, Estates, and Gifts*, 49 U. Chi. L. Rev. 859, 865 (1982).

Although the distinction between transactions that obscure economic reality and Code-compliant, tax-advantaged transactions may be difficult to identify in some cases, the transactions in this case are clearly on the legitimate side of the line. The Commissioner's effort to reclassify Summa Holding's transactions as dividends followed by Roth IRA contributions does not capture economic reality any better than describing them as DISC commissions followed by dividends to the DISC's shareholders. In what way is this "substantively" a contribution? Sure, the transaction in one sense looks like a Roth IRA contribution given the flow of money through the DISC and into the IRAs. But on balance the transaction looks even more like what it was—DISC commissions followed by dividends to the Roth IRAs. This is not a case where the taxpayers followed a "devious path" to a certain result in order to avoid the tax consequences of the "straight path," as in *Kluener* and *Aeroquip-Vickers*. *See Minn. Tea Co.*, 302 U.S. at 613. Both paths involve two straightforward steps: a disbursement from Summa Holdings (to either the DISC or the Benensons) followed by a transfer to the Roth IRAs (either as a dividend or a contribution).

When the Commissioner says that the transaction amounted in substance to a Roth IRA contribution, all he means is that the purpose of the transaction was to funnel money into the Roth IRAs without triggering the contribution limits. True enough. But the substance-over-

form doctrine does not authorize the Commissioner to undo a transaction just because taxpayers undertook it to reduce their tax bills.

Note that this broad recharacterization power travels along a one-way street. To our knowledge, the Commissioner has never used this power to reclassify the form of a taxpayer's Code-compliant transaction to *reduce* his tax liabilities in the service of broader purposes of the Code. But if this were a legitimate doctrine, why wouldn't it run in both directions? Many provisions of the Code owe their existence solely to tax-reducing purposes: to lower current taxes or to shelter income from taxes over time.

Only a parody of a purpose-based approach to interpretation, unanchored to statutory text, could justify a one-way use of this power. A broad recharacterization power runs in one direction only if we pitch the Internal Revenue Code's purpose at an Emperor's level of generality—that the "overarching" purpose of the Code, Appellee's Br. 39, is to increase revenue to the government. Then and only then could we say: When a taxpayer structures a business transaction in order to lower his tax bill, he undermines the revenue-increasing purposes of the Code and thus invites the Commissioner to recharacterize the transaction. But that view overlooks the subtleties of the Code, which create many discrete rules that balance many competing rationales. Doesn't a company have the right to do business as an S corporation rather than a C corporation based solely on tax-reduction considerations? Doesn't a company's management indeed have a *fiduciary duty* to make decisions on that basis? And what of using the corporate form at all? That's a liability-limiting choice after all. The best way to effectuate Congress's nuanced policy judgments is to apply each provision as its text requires—not to elevate purpose over text when taxpayers structure their transactions in unanticipated tax-reducing ways.

Yes, finite language must account for infinite tax transactions. And yes, we appreciate the challenges Congress faces in this area—an endless supply of tax-reducing ingenuity. *See ASA Investerings P'ship v. Comm'r*, 201 F.3d 505, 513 (D.C. Cir. 2000). But if there is one title of the United States Code most deserving of attention to text, it is Title 26. These are not the sparing terms of the Sherman Antitrust Act. This is the highly reticulated Internal Revenue Code, which uses language, lots of language, with nearly mathematic precision. Is there any

other title of the United States Code that has devoted more carefully drawn words to reducing its purpose to text? Perhaps the Commissioner's approach made some sense decades ago, when the Code was simpler, and before Congress decided to pursue a wide range of policy goals through a complicated set of tax credits, deductions, and savings accounts. But today, of all areas of law that should resist judicial innovation based on misty calls to higher purposes, this would seem to be it.

Statutory purpose no doubt has a role to play, even in its most capacious and inviting forms. "[T]he meaning of a sentence may be more than that of the separate words, as a melody is more than the notes." *Gregory*, 69 F.2d at 810–11 (Hand, J.). "A word is not a crystal, transparent and unchanged, it is the skin of a living thought." *Towne v. Eisner*, 245 U.S. 418, 425 (1918) (Holmes, J.). And all that. But purpose must be grounded in text. It cannot be invoked to save the statute from itself.

Even if we were willing to endorse the Commissioner's recharacterization power in its full flowering form—disregarding transactions based solely on an individual's tax-minimizing motive—he could not use it here. No court has used this power to override statutory provisions whose only function is to enable tax savings, as the Commissioner seeks to do in this instance. The Code authorizes DISC commissions and dividends, regardless of whether they have economic substance, in order to reduce the tax burden of exporters. And the Code authorizes investors to avoid significant taxes on capital gains and dividends by using their Roth IRAs in all manner of tax-avoiding ways, including by buying shares in promising new companies whose share prices may rise considerably over time or which may pay out large dividends over time. Deborah L. Jacobs, *How a Serial Entrepreneur Built a $95 Million Tax Free Roth IRA*, Forbes (Mar. 20, 2012); Government Accountability Office, *IRS Could Bolster Enforcement on Multimillion Dollar Accounts, but More Direction from Congress Is Needed* (October 20, 2014); William D. Cohan, *The Secret Behind Romney's Magical IRA*, Bloomberg (July 15, 2012, 6:30 PM). The point of these entities *is* tax avoidance. The Commissioner cannot place ad hoc limits on them by invoking a statutory purpose (maximizing revenue) that has little relevance to the text-driven function of these portions of the Code (minimizing revenue).

The Commissioner persists that Congress intended Roth IRAs to be used only by median-income and low-income taxpayers, as evidenced by the contribution and income limits. We have our doubts. When pressed, the Commissioner knew of no empirical data to support the point. At any rate, Congress's decision in 2005 to allow owners of traditional IRAs, who can make contributions regardless of income, to roll them over into Roth IRAs no matter how many assets the accounts hold or how high the owners' incomes, *see* 26 U.S.C. § 408A(d)(3), undercuts this contention. Those rollovers permit high-income taxpayers to avoid the income limits on Roth IRA contributions, just as the DISC permitted Summa Holdings to avoid the contribution limits. The Commissioner cannot fault taxpayers for making the most of the tax-minimizing opportunities Congress created.

The Commissioner adds that the "critical point" of his argument is that the tax benefits Summa Holdings has enjoyed were "unintended by both the Roth IRA and DISC provisions." Appellee's Br. 45. He may be right. And he may be right that permitting these DISC–Roth IRA arrangements amounts to dubious tax policy. But the substance-over-form doctrine does not give the Commissioner a warrant to search through the Internal Revenue Code and correct whatever oversights Congress happens to make or redo any policy missteps the legislature happens to take. Congress created the DISC and empowered it to engage in purely formal transactions for the purpose of lowering taxes. And Congress established Roth IRAs and their authority to own shares in corporations (including DISCs) for the purpose of lowering taxes. That these laws allow taxpayers to sidestep the Roth IRA contribution limits may be an unintended consequence of Congress's legislative actions, but it is a text-driven consequence no less. Congress likewise did not expect it would increase the utility of DISCs when it lowered the qualified dividend rate in 2003, but no one would argue that DISC dividends should still be taxed at the old rate. *See* Michael S. Fried, *Combined Effects of Recent Legislation Breathe New Life into the IC-DISC*, 118 J. Tax'n 220, 224–25 (2013).

This is not the first time, for what it is worth, that DISCs have caused the Federal Government trouble. In the 1980s, some countries alleged that DISCs illegally subsidized U.S. exports in violation of the General Agreement on Tariffs and Trade. Congress responded by requiring shareholders to pay annual interest on their deferred tax liability. *See* Deficit

Reduction Act of 1984, Pub. L. No. 98-369, § 801(a), 98 Stat. 494, 985.   And Congress addressed one problem created by tax-exempt entities like IRAs by imposing the unrelated business income tax on their DISC dividends.  If Congress sees DISC–Roth IRA transactions of this sort as unwise or as creating an improper loophole, it should fix the problem.  Until then, the DISC will continue to provide tax savings to the owners of U.S. export companies, just as Congress intended—even if subsequent changes to the Code have increased the scale of the savings beyond Congress's original estimation.  The last thing the federal courts should be doing is rewarding Congress's creation of an intricate and complicated Internal Revenue Code by closing gaps in taxation whenever that complexity creates them.

For these reasons, we reverse.