RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 19a0092p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

BILLY F. HAWK, JR., GST NON-EXEMPT MARITAL TRUST, Trustee, Transferee, Nancy Sue Hawk and Regions Bank, Co-Trustees; ESTATE OF BILLY F. HAWK, JUNIOR, Trustee, Transferee, Nancy Sue Hawk and Regions Bank, Co-Executors; BILLY F. HAWK, JR., GST EXEMPT MARITAL TRUST, Trustee, Transferee, Nancy Sue Hawk and Regions Bank, Co-Trustees; NANCY SUE HAWK, Transferee,

                    *Petitioners-Appellants*,

     *v.*

COMMISSIONER OF INTERNAL REVENUE,

                    *Respondent-Appellee*.

> No. 18-1534

─────────────

Appeal from the United States Tax Court;
Nos. 30024-09; 30025-09; 30026-09; 30515-09—Joseph R. Goeke, Judge.

Argued:  April 30, 2019

Decided and Filed:  May 15, 2019

Before:  GUY, SUTTON, and NALBANDIAN, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:**  J. Eric Butler, LEWIS, THOMASON, KING, KRIEG & WALDROP, P.C., Knoxville, Tennessee, for Appellants.  Arthur T. Catterall, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:**  J. Eric Butler, Katherine Sanford Goodner, LEWIS, THOMASON, KING, KRIEG & WALDROP, P.C., Knoxville, Tennessee, Ashley Hodges Morgan, LEWIS, THOMASON, KING, KRIEG & WALDROP, P.C., Memphis, Tennessee, David S. Garbett, Brian P. Yates, GARBETT, ALLEN & ROZA, P.A., Miami, Florida, John P. Konvalinka, GRANT, KONVALINKA & HARRISON, P.C., Chattanooga, Tennessee, for Appellants.  Arthur T. Catterall, Gilbert S. Rothenberg, Richard Caldarone, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

————————————

**OPINION**

————————————

SUTTON, Circuit Judge.  After Billy Hawk died in 2000, his wife Nancy Sue decided to sell the family bowling business, Holiday Bowl.  With the help of lawyers and accountants, she made a deal with MidCoast, a company that claimed an interest in acquiring companies with corporate tax liabilities that it could set off against its net-operating losses.  Holiday Bowl first sold its assets—bowling alleys—to Bowl New England, receiving $4.2 million in cash and generating about $1 million in federal taxes.  After that, Nancy Sue and Billy's estate sold Holiday Bowl to MidCoast for about $3.4 million, in essence exchanging one pile of cash for another minus the tax debt MidCoast agreed to pay.  But MidCoast never paid the taxes.  The United States filed this transferee-liability action against Nancy Sue Hawk and Billy Hawk's estate to recover Holiday Bowl's unpaid taxes.  The Tax Court ruled for the government, concluding that the Hawks were transferees of a delinquent taxpayer under federal law and permitting the government to recover the unpaid taxes from the Hawks under Tennessee law. We affirm.

I.

When shareholders sell a privately held corporation, they have a range of options.  One is an asset sale, in which the corporation sells its assets (e.g., the bowling alleys), pays a tax on the gain, and distributes what's left to the shareholders.  In this setting, the Commissioner taxes the corporation upon the sale of the assets and taxes the shareholders when they receive their distributions.

Another option is a stock sale, in which the shareholders sell their stock to a third party. Because the corporation never sells its assets, the transaction doesn't trigger corporate tax, and the original shareholders pay only their individual income taxes.  If the new owners dispose of the corporate assets down the road, however, the corporation will incur taxes then.  Buyers in a stock sale often pay less to account for future taxes they must pay.

After Billy Hawk's death in 2000, Nancy Sue owned almost a fifth of the company's stock and her husband's estate owned the remainder. Billy and Nancy Sue's two sons operated the two bowling alleys awhile. But that didn't work. By 2002, she realized she needed to sell Holiday Bowl. She chose an asset sale to Bowl New England. The sale left Holiday Bowl with $4.2 million in cash and left the company owing about $1 million in federal income taxes and about $200,000 in state taxes. Holiday Bowl also owned some real property, a family horse farm that Nancy Sue wanted to keep, valued at $777,000.

Trying to lower the corporate taxes triggered by the transaction, the Hawks' broker approached their attorney with information about a company called MidCoast that had "tremendous tax-loss carry-forwards." J.A. 3 at 797. If MidCoast bought Holiday Bowl, the broker advertised, Holiday Bowl would not need to pay corporate taxes on the asset sale. As a result, MidCoast promised to pay the Hawks more than Holiday Bowl's actual value—what would have been its cash on hand minus outstanding taxes. Nancy Sue Hawk and the estate stood to keep an extra $200,000 to $300,000 by structuring the transaction in this way. MidCoast purported to offer Holiday Bowl a way to realize the best attributes of an asset sale (the higher sale price of the assets) and a stock sale (no corporate-level tax). In closing his recommendation, the broker, warily but not warily enough, said: "[I]f it seems too good to be true, it probably is. But maybe this is the exception." *Id.* at 798.

The Hawks proceeded to enjoy what looked like a free lunch. Under the purchase agreement, the Hawks sold Holiday Bowl some of their shares in exchange for the company's remaining property, the horse farm. That left Holiday Bowl with nothing but cash. MidCoast paid $3.4 million plus expenses for Holiday Bowl's $4.2 million. To finance the transaction, MidCoast claimed it would borrow money from a company called Sequoia Capital. According to MidCoast, Holiday Bowl would then enter the debt-collection business, rapidly generating new losses that would offset Holiday Bowl's existing taxes.

After the sale, MidCoast transferred Holiday Bowl to Sequoia in exchange for the cancellation of Sequoia's loan and about $320,000 in cash. No one ever paid Holiday Bowl's outstanding taxes, and the one-time bowling company dissolved in 2006.

The Internal Revenue Service investigated MidCoast, uncovering the Holiday Bowl sale and about sixty similar transactions. That did not end well for MidCoast, Sequoia, and a law firm, as a grand jury indicted several individuals associated with each of them. One defendant pleaded guilty. Others fled the country. The government launched a civil collection proceeding against the Hawks in pursuit of Holiday Bowl's unpaid taxes. The Tax Court concluded that Sequoia's loan to MidCoast was a sham and that Holiday Bowl had simply distributed cash to the Hawks, who were liable to the government as Holiday Bowl's fraudulent transferees. This appeal followed.

II.

To prevent delinquent individuals and corporations from evading taxes by transferring their assets to other entities, Congress enacted 26 U.S.C. § 6901. The statute permits the government to pursue a delinquent taxpayer's transferees in federal court. Once there, the government stands in the position of a private creditor, and state law determines whether the transferee must pay the taxpayer's debts. *See Comm'r v. Stern*, 357 U.S. 39, 47 (1958).

Two examples illustrate what § 6901 is getting at. Imagine Company A. It has $5 million in assets that have a basis (cost) of $1 million. Let's say Company A sells its assets (a manufacturing plant) to Company B for cash. At that point, Company A would owe federal taxes on the $4 million gain generated by the sale. But suppose that Company A's owners decide not to pay Company A's taxes. They instead pay themselves $5 million and simply let Company A go belly-up, leaving Company A's taxes unpaid. That leaves a classic transferee liability for the owners under § 6901.

What happens, however, if the owners try to avoid that liability with an intermediary transaction? The owners sell Company A to a foreign Company C for $5 million—the exact amount of money that Company A has in the bank. This leaves the owners with $5 million, and Company C with $5 million in Company A, and Company A still needing to pay its taxes. Because Company C is outside the United States, the government might not be able to pursue Company C as a transferee when it empties Company A's coffers and no one pays A's taxes.

In this setting, a court might decide that the sale of Company A had no economic substance to it, and that the owners *really* transferred Company A's cash directly to themselves.

Applied here, § 6901 prompts three questions: (1) Did Holiday Bowl owe any taxes? (2) Are the Hawks transferees of Holiday Bowl? (3) If so, are the Hawks liable to the government under Tennessee's fraudulent transfer statute? *See Stern*, 357 U.S. at 41.

1. *The Initial Taxpayer*. No one disputes that Holiday Bowl incurred taxes on the sale of its assets.

2. *Transferees*. The Hawks also amount to transferees. Section 6901(h) says that transferees include a "donee, heir, legatee, devisee, and distributee." The Hawks do not dispute that Holiday Bowl transferred the horse farm to them under this definition. Nor could they. The company "distribute[d]" the property to the Hawks in exchange for stock.

So too when it comes to the $3.4 million they received for the Holiday Bowl sale. But this conclusion contains a complication or two. As the Hawks see it, they were "distributees" of funds from MidCoast, not Holiday Bowl. As the government sees it, that transaction was a sham, as MidCoast simply paid the Hawks with Holiday Bowl's money, making them distributees of funds from Holiday Bowl all the same.

All of this requires a digression about a doctrine, in truth a series of doctrines, by which courts look to "the economic realities of the business deal" to determine whether a transaction occurred as the taxpayer labeled it. *Summa Holdings, Inc. v. Comm'r*, 848 F.3d 779, 785 (6th Cir. 2017). While taxpayers are free to arrange their affairs to minimize taxes, they must do so in real ways—ways that give a transaction economic teeth and do not merely place tax-avoiding labels on tax-owing transactions. *Gregory v. Helvering*, 293 U.S. 465, 469 (1935); *Summa Holdings*, 848 F.3d at 787. Separating unlawful tax shelters from lawful tax avoidance is always context specific and sometimes difficult to pin down.

The Tax Court permissibly refused to respect several features of the form that MidCoast and the Hawks tried to place on this transaction. Start with the ostensibly independent financing of it: the Sequoia loan. The Tax Court found that the Hawks didn't even get Sequoia's

(ostensibly) loaned funds. They got Holiday Bowl's own funds, which were wired into an escrow account and promptly funneled back from the same escrow account to the Hawks. The quintessential explanation for refusing to respect the form of a transaction is that it amounts to a charade. What purported to be real, a Sequoia loan to MidCoast to finance the sale, was not in fact real, as MidCoast paid for the transaction with Holiday Bowl funds.

Even aside from tracing where the dollars and cents came from and where they eventually went, the Sequoia loan looked like an impostor on paper. Under the terms of the deal, Sequoia had no risk because Holiday Bowl's own cash served as the collateral for the loan. The idea was that lenders traditionally require security for a loan. And this loan looked like it had security. But an immediately repayable, cash-for-cash loan backed up by cash is not a traditional loan. Money is fungible. So is air. By getting a "loan" from Sequoia, MidCoast could access cash, which it then could immediately pay back with Holiday Bowl's own money—in effect using Holiday Bowl's bank account at no risk to Sequoia. In this setting, the security was no security at all.

It gets worse. The parties didn't sign most of the loan documents, behavior that does not accord with the way people usually transfer large pots of money. Interest and periodic payments are a classic hallmark of real loans. *See Roth Steel Tube Co. v. Comm'r*, 800 F.2d 625, 631 (6th Cir. 1986). But Sequoia's loan wouldn't incur interest unless MidCoast defaulted. While Sequoia did stand to make about $17,250 when MidCoast paid back the loan, this translated to annual interest of $6.3 million, nearly double what MidCoast borrowed. At dusk's end, Holiday Bowl distributed its money to the Hawks, in substance if not always in form, making them the company's transferees.

The problem by the way is not that the Hawks were trying to lower their taxes. No American to our knowledge prefers a higher tax bill. There are other ways to express fealty to our country. The problem is that the transaction lacked economic substance; it was nothing but misleading labels and distracting forms—trompe l'oeil from start to finish.

Precedent, too, looks askance at what the Hawks and their advisors did. Over forty years ago, this court faced a similar transaction, in which a shareholder sold a business holding only

cash and tax liabilities to buyers who claimed—much like MidCoast—to be able to reduce the business's taxes based on existing business losses. The buyers borrowed the purchase price and immediately liquidated the business. *See Owens v. Comm'r*, 568 F.2d 1233, 1236 (6th Cir. 1977). In concluding that the transaction was a sleight-of-hand distribution to the original shareholder, *Owens* noted that "tax liabilities cannot be altered on the basis of parties exchanging the most fungible commodity of all, cash." *Id.* at 1240. Just so here.

The Seventh Circuit reached a similar conclusion in a similar setting. The Feldman family owned and operated Woodside Ranch, an outdoor resort. *See Feldman v. Comm'r*, 779 F.3d 448, 450 (7th Cir. 2015). As here, the Feldmans decided to sell the company's assets for cash and incurred large capital gains taxes. *Id.* at 451. And as here, MidCoast entered the picture with a promise to "pay more for the shares than they were worth," if you simply subtracted the tax owed from the cash that Woodside Ranch had. *Id.* When Woodside never paid its taxes, the government went after the Feldmans.

The Seventh Circuit concluded that the Woodside sale was in truth a distribution to the Feldmans. *Id.* at 456. Some aspects of that case, it is true, made it easier. MidCoast's loan in that case "was entirely undocumented." *Id.* In this instance, MidCoast and Sequoia drew up loan documents, though they never signed most of them. And in *Feldman*, MidCoast didn't sell the business to the lender; it just immediately repaid the loan. *Id.* But the core of *Feldman* and our case remains the same: a cash swap that amounts to a distribution to the shareholders, not a real sale.

Because the Hawks were transferees under § 6901, the government may pursue them in federal court. That leaves the question of liability under Tennessee law.

3. *Liability Under Tennessee Law.* Tennessee has adopted the Uniform Fraudulent Transfer Act, which provides remedies to creditors (like the United States) when insolvent debtors fraudulently transfer assets to third parties. *See* Tenn. Code Ann. § 66-3-301 *et seq*. The Act treats a transfer as fraudulent "if the debtor made the transfer . . . without receiving a reasonably equivalent value in exchange for the transfer . . . and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer." *Id.* § 66-3-306(a). The law

prompts three inquiries of its own: Did the Holiday Bowl transaction count as a transfer? Did Holiday Bowl receive reasonably equivalent value in exchange? Did Holiday Bowl become insolvent?

First, for many of the same reasons the Holiday Bowl transaction amounts to a *transfer* to the Hawks under federal law, it counts as a transfer from Holiday Bowl to the Hawks under Tennessee law. Tennessee law defines a transfer broadly to include "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance." *Id.* § 66-3-302(12). Apt is the word "indirect." Even if the Hawks received Sequoia's money (which they didn't), the Hawks still would have received Holiday Bowl's funds indirectly.

Tennessee courts also consider the economic substance of the Holiday Bowl transaction. The Uniform Fraudulent Transfer Act incorporates traditional "principles of . . . equity." *Id.* § 66-3-311. And Tennessee courts have long relied on sham-transaction principles in settings like this one. *See, e.g.*, *CAO Holdings, Inc. v. Trost*, 333 S.W.3d 73, 88 (Tenn. 2010); *M. & M. Stamp Co. v. Harris*, 368 S.W.2d 752, 755 (Tenn. 1963). The Tennessee statute also directs that it "shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this [statute] among states enacting it." Tenn. Code Ann. § 66-3-312. And other courts have held that the sham-transaction principles apply to other States' Uniform Fraudulent Transfer Acts. *See, e.g.*, *Feldman*, 779 F.3d at 459 (interpreting the Wisconsin statute); *In re AFI Holding, Inc.*, 525 F.3d 700, 708 (9th Cir. 2008) (interpreting the California statute).

Second, Holiday Bowl didn't receive *reasonably equivalent value* for the horse farm or the cash that the company transferred to the Hawks. The Act defines value as "property" transferred or "an antecedent debt . . . secured." Tenn. Code Ann. § 66-3-304(a). When the Hawks exchanged stock for the horse farm, the transaction merely subtracted from Holiday Bowl's balance sheet. And Holiday Bowl got nothing when the Hawks received their $3.4 million.

Third, Holiday Bowl also became *insolvent* due to this transaction. After the Hawks received their cash back, Holiday Bowl had only about two-thirds of the money that it needed to pay its outstanding taxes.

Nancy Sue Hawk and Billy's estate resist this conclusion on several grounds.

They say that the Tennessee courts wouldn't look to the reality of the transaction to determine what happened. *CAO Holdings, Inc. v. Trost* proves otherwise. 333 S.W.3d 73 (Tenn. 2010). The Tennessee Supreme Court remanded a case at summary judgment to determine whether a transaction was a sham. *Id.* at 88–90. While it's true that one unpublished Tennessee Court of Appeals case declared that "[n]o Tennessee court has applied the economic substance doctrine," the petitioners read too much into the comment. *Niuklee, LLC v. Comm'r, Tenn. Dep't of Revenue*, No. M2014-01644-COA-R3-CV, 2015 WL 6941593, at *7 (Tenn. Ct. App. Nov. 9, 2015). It's clear that Tennessee courts have applied equitable principles to scrutinize the economic realities of transactions in a variety of situations.

The Hawks take issue with the Tax Court's conclusion that they knew about MidCoast's fraudulent scheme. But Tennessee courts look to the economic realities of the transaction regardless of whether the Hawks knew about the fraud. When it comes to constructive fraud, Tennessee's Uniform Fraudulent Transfer Act doesn't require the transferee to know about the debtor's misconduct. Instead, transferees who deal in good faith can offset their liability by whatever they paid the debtor for the transferred asset—that is, by whatever money they added to the pool available to creditors. But acting in good faith without more doesn't preclude transferee liability. *See* Tenn. Code Ann. § 66-3-309(d).

Some history shows why. The Uniform Fraudulent Transfer Act replaced an older model statute, which had required that creditors prove transferees received an asset from a debtor "without a fair consideration." Unif. Fraudulent Conveyance Act § 4 (Unif. Law Comm'n 1918). The former Act defined "fair consideration" as the exchange of property "in good faith." *Id.* § 3. According to official comments to the new Fraudulent Transfer Act, the drafters of that statute intentionally replaced the words "fair consideration" with "reasonably equivalent value" to eliminate any inquiry into the *transferee's* intent when determining whether a transfer is

constructively fraudulent.  *See* Tenn. Code Ann. §§ 66-3-305 cmt. 2, 66-3-306 cmt. 1; *see also id.* § 66-3-313 (directing courts to the official comments).

Other courts have said that constructive fraud under the Fraudulent Transfer Act can be established without determining whether the transferee acted in good faith.  *See Feldman*, 779 F.3d at 459–60; *Weintraut v. Comm'r*, 112 T.C.M. (CCH) 122, 2016 WL 4040793, at \*72 (T.C. 2016); *Thompson v. Hanson*, 239 P.3d 537, 541 (Wash. 2009); *see also Shockley v. Comm'r*, 872 F.3d 1235, 1254 n.17 (11th Cir. 2017).

As for cases in which the recharacterization of the transaction and thus constructive fraud turned on showing that the transferees knew about the sketchiness of the tax shelter, they either applied the Uniform Fraudulent Conveyance Act or relied on cases that interpreted the older Act. *See, e.g.*, *Diebold Found., Inc. v. Comm'r*, 736 F.3d 172, 186 (2d Cir. 2013) (interpreting Uniform Fraudulent Conveyance Act); *Salus Mundi Found. v. Comm'r*, 776 F.3d 1010, 1020 (9th Cir. 2014) (following *Diebold* to interpret the same Uniform Fraudulent Conveyance Act); *Starnes v. Comm'r*, 680 F.3d 417, 433 n.10 (4th Cir. 2012) (imposing a knowledge requirement in a Uniform Fraudulent Transfer Act case while citing a Fraudulent Conveyance Act case); *see also Frank Sawyer Tr. v. Comm'r*, 712 F.3d 597, 605 (1st Cir. 2013) (applying state-specific equity law to interpret the Uniform Fraudulent Transfer Act).

The bottom line?  The Hawks' "extensive emphasis on their due diligence and lack of knowledge of illegality" doesn't shield them from the sham nature of the transaction and absolve them of transferee liability.  *Feldman*, 779 F.3d at 460.  That's the same conclusion the Seventh Circuit reached in *Feldman*, another MidCoast case, one that applied Wisconsin law and its Uniform Fraudulent Transfer Act.  *Id.*

Switching gears, the Hawks claim that Sequoia's loan wasn't a sham, pointing to provisions in the deal documents that ostensibly prevented the escrow agent from wiring Holiday Bowl's cash directly to them.  But one point of the sham-transaction doctrine is to look at what happened in fact, not what happened on paper.

To similar effect, the Hawks claim that the lack of signatures on the loan documents did not delegitimate the loan.  That may be true.  But that truth does not take away from the reality

that prudent lenders in traditional transactions normally do not let such papers go unsigned or the reality that sloppiness often arises when no risk exists. So it was with this "loan."

The Hawks claim that MidCoast's $17,250 payment to Sequoia constituted a loan fee, proving that there was economic substance to the loan. The better reading is the one the Tax Court gave: that the fee compensated Sequoia for participating in the scheme. Even on its own terms, the loan didn't generate interest unless MidCoast defaulted, not a traditional way to calculate loan interest. A conventional approach to calculating interest would have made the $17,250 amount usurious in the extreme—about a 183% annual rate.

The Hawks persist that a series of transactions shows that Sequoia made a real loan. Over a week before the Holiday Bowl sale, Sequoia placed $35 million into a separate money market account with the same escrow agent. The day after the Holiday Bowl sale, the agent moved much of that money into the escrow account used for the Holiday Bowl transaction. The escrow agent then transferred $4 million to a company called Delta Trading Partners, at the purported "instructions of Holiday Bowl's newly appointed president." J.A. 3 at 455.

But none of this requires overturning the Tax Court's finding that the transaction lacked meat on the bones. For one thing, the Tax Court found the escrow agent's records unreliable, and the Hawks admit that some of the handwritten ledgers were "incorrect" and conflicted with typed ledgers. Reply Br. 9. For another, the Hawks didn't receive a portion of the $35 million. As shown above, they received Holiday Bowl's money in the escrow account. For still another, even if the Sequoia loan had occurred, that doesn't change the underlying reality of what happened. From an economic standpoint, Sequoia could have sent the Hawks Sequoia's money and then transferred Holiday Bowl's cash to Delta Trading Partners. Or Sequoia could have sent the Hawks Holiday Bowl's funds and used its own money to pay Delta Trading Partners. Either way, Sequoia's "loan" bore no risk, the Hawks received the same amount, and so did Delta Trading Partners.

The Hawks take aim at the Tax Court's conclusion that this transaction rendered Holiday Bowl insolvent. They attempt to argue that the escrow agent didn't wire Holiday Bowl's money to them. Escrow accounts like this one often hold funds for more than one client at once. The

Hawks encourage us to use first-in-first-out accounting and conclude that they received other clients' funds unrelated to the Holiday Bowl sale, leaving much of Holiday Bowl's money untouched in the escrow account. Whatever the value of the first-in-first-out accounting method to disentangle intermingled assets, however, the Tax Court could identify which deposits and payments corresponded to the Holiday Bowl transaction. No convincing basis for overturning that finding has emerged. What's more, even if we apply first-in-first-out accounting, the problem does not go away. If Holiday Bowl benefited from the transfer of other clients' money, it would remain on the hook to the true owners, making Holiday Bowl insolvent all the same.

Along the same lines, the Hawks point to Sequoia's post-sale movement of money into the escrow account and the $4 million wire to Delta Trading Partners as indicating that Holiday Bowl controlled $4 million before Sequoia liquidated the company. But that assumes Sequoia's loan to MidCoast (and its other attempts to shift funds) were not shams or devoid of economic substance. The assumption does not hold.

Last of all, the Hawks point to *Alterman v. Commissioner*, a MidCoast case in which the Tax Court refused to collapse the transaction under Florida's Uniform Fraudulent Transfer Act. 110 T.C.M. (CCH) 507, 2015 WL 7753344, at *23 (T.C. 2015). But the Tax Court in *Alterman* required the government to prove that the sellers knew about the fraud based on another Tax Court decision applying prior Conveyance Act case law. *Id.* at *17. That ignored the purpose of constructive fraud under the Transfer Act: to remove knowledge from the equation.

\* \* \*

For those readers still with us, you might wonder: Was there a way to make this tax-reduction strategy work? Was it ever possible for MidCoast to offset Holiday Bowl's taxes with net operating losses, say by making the Sequoia loan a kosher one and dotting another "i" and crossing another "t" in the underlying transactions? The answer is "maybe" in the abstract and "not likely" here.

As one treatise puts it, "Congress, with assistance from the courts, has constructed a formidable defense against taxpayer efforts to traffic in net operating losses and other corporate tax benefits." Boris I. Bittker & James S. Eustice, *Federal Income Taxation of Corporations and*

*Shareholders* § 14.02 (7th ed. 2019).  The Internal Revenue Code prevents a company with pre-existing losses from purchasing a company with pre-existing gains and canceling the two out within five years of the sale.  *See* 26 U.S.C. § 384; Bittker & Eustice, *supra*, § 14.45.

That's why MidCoast told the Hawks that it would operate Holiday Bowl as a debt-collection business and generate new losses within Holiday Bowl—a different strategy from the one the broker originally proposed.  For this scheme to eliminate Holiday Bowl's 2003 taxes, it appears, the new losses needed to arise between the November 2003 sale and the end of the year.  After hearing the evidence, the Tax Court concluded that "[i]t was not plausible" that a MidCoast-owned Holiday Bowl could ever incur the necessary "offsetting expenses" in time. J.A. 3 at 481.

That reality and others too separate this case from *Summa Holdings, Inc. v. Commissioner*, 848 F.3d 779 (6th Cir. 2017).  Those taxpayers sought to take advantage of two investment vehicles—a "domestic international sales corporation" and a Roth IRA.  The former allows an exporter to shelter certain income from corporate tax.  *Id.* at 782.  The latter allows individuals to save limited amounts tax free.  *Id.* at 783.  Done together, a Roth IRA owning shares in a domestic international sales corporation permits taxpayers to transfer (and potentially grow) many assets in their Roth IRAs and spare themselves considerable taxes.  *Id.*

That's exactly what the *Summa Holdings* taxpayers did.  Citing the substance-over-form doctrine, however, the Commissioner claimed authority to ignore the form of the legislatively approved transactions.  We disagreed because "[the] Internal Revenue Code allowed" the taxpayers "to do what they did."  *Id.* at 784.  Courts (and agencies) must respect a statute's text, and the Commissioner's revision took the substance-over-form doctrine a "step too far."  *Id.* at 785.  The Commissioner, we acknowledged, may "honor the fiscal realities of what taxpayers have done over the form in which they have done it."  *Id.*  But neither the Commissioner in particular nor the Executive Branch in general may rewrite "the meaning of statutes" whenever it dislikes the law.  *Id.*

Think about it.  Everyone in *Summa Holdings* agreed that the plain terms of the relevant statutes permitted the transaction.  *Id.* at 784.  Not even *Chevron* permits government agencies to

ignore the plain text of a statute. *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984). What, then, made the Internal Revenue Service think it could ignore the plain text of a statute—one that other agencies could not override under *Chevron*—under the substance-over-form doctrine? This version of the doctrine makes *Chevron* look like a modest assumption of executive power. When all was said and done, *Summa Holdings* was a case in which the taxpayers forced the government to play it straight—to make *it* respect the form and substance of the laws Congress wrote.

That leaves two sides to the substance and form coin. On one side is *Summa Holdings*. If Congress authorizes taxpayers to do something—in *Summa Holdings*, employing Code-compliant "shell corporations . . . that have no economic substance"—the Commissioner can't override the constitutional forces of bicameralism and presentment. *Summa Holdings*, 898 F.3d at 786. On the other side is the Hawks' case. The government isn't seeking to ignore the form of the Code today. It's enforcing the statutes as written. No one disputes that Holiday Bowl owed taxes that the Code imposes. The Code places substantial limits on even the above-board version of this transaction, limits that foreclosed MidCoast's ability to offset Holiday Bowl's pre-existing gains. What's more, § 6901 provides a mechanism for the government to pursue a delinquent taxpayer's assets in cases just like this one. Tennessee law seeks a similar end. All in all, the Commissioner isn't disregarding statutory text in the name of economic substance; he's honoring the written word and the economic realities of this transaction.

We affirm.